**O. HOMMEL COMPANY, Appellee,**

v.

**FERRO CORPORATION, Appellant.**

**Nos. 80–2062, 80–2723.**

United States Court of Appeals,
Third Circuit.

Argued May 22, 1981.

Decided Sept. 2, 1981.

Rehearing and Rehearing En Banc
Denied Sept. 23, 1981.

George I. Meisel (argued), Squire, Sanders & Dempsey, Cleveland, Ohio, for appel-

lant; Miles W. Kirkpatrick, Morgan, Lewis & Bockius, Washington, D. C., Arthur J. Schwab, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., of counsel.

David B. Buerger (argued), Martha Z. Zatezalo, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Professional Corp., Pittsburgh, Pa., for appellee.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

OPINION OF THE COURT

GARTH, Circuit Judge.

The O. Hommel Company brought suit against the Ferro Corporation, claiming that Ferro had violated § 2 of the Sherman Act, 15 U.S.C. § 2 (1976) and § 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13 (1976). Between 1973 and 1977, Ferro sold porcelain enamel frit to three customers at a price lower than the price it charged other customers, and below its average total cost. The district court refused to enter a directed verdict for Ferro, and the jury found that Ferro had violated the Robinson-Patman Act, 15 U.S.C. § 13, but not the Sherman Act. Ferro's subsequent motion for judgment notwithstanding the verdict on the Robinson-Patman count was denied.

We hold that there was insufficient evidence upon which to predicate Robinson-Patman liability, and thus we reverse and direct that judgment be entered for Ferro.

I.

A.

Both Ferro Corporation and O. Hommel Corporation (Hommel) manufacture and sell two kinds of frit. Porcelain enamel frit is the basic ingredient in the coating of such products as bathtubs, stoves, washing machines and refrigerators. These frits:

> are sold by plaintiff and defendant in conjunction, at times, with other frits and always with "additions" or "additives" of

clay, electrolytes and other substances necessary to produce a porcelain enamel coating with the buyer's desired properties. The frits and additions or additives are assembled by the customer on a predetermined formula in what is called a "batch" which is milled or ground with water to produce a porcelain enamel "slip". The slip is applied to the steel appliance part by spraying, dipping or flow coating. It is then dried and fused by heat which produces the porcelain enamel finish.

I App. at 55–56.

The companies also manufacture ceramic frit which is the basic ingredient in the glaze coating on products such as dishes. The jury's verdict on Robinson-Patman discrimination, however, was based only on sales of the porcelain enamel frit.[1] There is no major difference in the method of manufacturing the two types of frit (II App. at 413), and "generally speaking" the Ferro and Hommel production methods were the same. (II App. at 416).

Hommel has one plant in Carnegie, Pennsylvania. Frit (both porcelain enamel and ceramic) is its principal product, constituting 53% to 68% of sales. Its net worth is about $2.5 million, and its annual sales during the 1973 to 1977 period generally were in the range of $7,000,000. Hommel's income before taxes increased from $12,902 in 1973 to $256,615 in 1977. (IV App. at 212–16). Its gross profits on the sale of porcelain enamel frit were approximately $475,000 in 1973 and $540,000 in 1977, although when selling, laboratory, and general and administrative expenses were allocated, it showed net losses each year. (IV App. at 217–21). Its net loss, however, on these frit sales was $19,000 in 1977 compared to $259,000 in 1973. *Id.*

Ferro is a multinational corporation with several divisions. Its net worth is about $150,000,000 and during the applicable period its sales averaged $334,000,000. Ferro

---

1. Although both types of frit, porcelain enamel and ceramic, are produced by the parties, and are the subject of the litigation, the issues on this appeal center on porcelain enamel frit, the only frit involved in Ferro's price discriminations. Hommel brief at 15.

manufactures frit in the United States at plants in Los Angeles, Nashville, and Cleveland. . The alleged illegal sales all concerned frit manufacture at the latter two plants.

There are five manufacturer-sellers of porcelain enamel frit. Ferro is the largest producer and Hommel is one of the two smallest. Chicago Vitreous and Pemco, the next two largest manufacturers after Ferro, are both divisions of multinational conglomerates larger than Ferro. During the 1973–77 period, the years during which the alleged violations occurred, the sales of porcelain enamel frit (in thousands of pounds) were as follows:

|  | Industry | Ferro | Chicago Vitreous |
|---|---|---|---|
| 1973 | 180,188 | 76,365 | 41,064 |
| 1974 | 144,243 | 61,995 | 32,905 |
| 1975 | 111,484 | 46,507 | 27,804 |
| 1976 | 125,936 | 51,067 | 30,915 |
| 1977 | 134,397 | 54,200 | 31,921 |

|  | Pemco | Hommel | Ingraham-Richardson |
|---|---|---|---|
| 1973 | 38,086 | 12,247 | 12,426 |
| 1974 | 31,628 | 9,278 | 8,437 |
| 1975 | 24,816 | 6,480 | 5,877 |
| 1976 | 30,907 | 7,615 | 5,432 |
| 1977 | 32,662 | 9,162 | 6,452 |

These figures resulted in the following market shares for sales of porcelain enamel frit:

|  | Ferro | Chicago Vitreous | Pemco | Hommel | Ingraham-Richardson |
|---|---|---|---|---|---|
| 1973 | 42% | 23% | 21% | 7% | 7% |
| 1974 | 43 | 23 | 22 | 6 | 6 |
| 1975 | 42 | 25 | 22 | 6 | 5 |
| 1976 | 41 | 25 | 25 | 6 | 4 |
| 1977 | 40 | 24 | 24 | 7 | 5 |

These figures do not include production by four concerns that produce porcelain enamel frit for their own production needs. (III App. at 617).

As can be seen from the production figures, during the 1973 to 1975 period the frit industry went into a steep decline from which it only partially recovered. The 1977 porcelain enamel frit production was less than 75% of the 1973 production. Ferro suffered a 29% loss of sales during the five year period, and its market share fell from 42% to 40%. Hommel had a 25% decline in sales during that same period, and a 7% market share in both 1973 and 1977. Only part of the decline in sales can be attributed to the 1974 recession. The porcelain enamel frit industry was facing increasing competition from other products. Paint and plastic products were being substituted for porcelain enamel frit. An increase in the imports of products to which frit is applied, also hurt the demand for domestic frit.

Prices for frit generally rose during the 1973 to 1977 period. (*See, e. g.*, IV App. at 393). All five of the firms had published price lists, but neither Hommel nor Ferro put all their price quotations on their published lists. (II App. at 341). Ferro also had a confidential, "special price list" for porcelain enamel frit. (IV App. at 15–22, Joint Exhibits 10–13). Prices varied with the type of porcelain enamel frit sold.

### B.

Robinson-Patman liability was based on sales to three customers: General Housewares, Briggs, and General Electric. Porcelain enamel frit was sold to these customers below the published list price and below Ferro's average total cost (III App. at 484–488),[2] but above Ferro's average variable cost (which Ferro approximates as its direct manufacturing cost).[3] (Joint Exhibits 718, 719, IV App. at 392d–394).

The discriminatory sales made to General Housewares, Briggs and General Electric constituted no more than 5% of Ferro's national porcelain enamel frit sales during this 1973–1977 period, (Ferro brief at 7), and 2% of the domestic sales made by all frit companies during this period. *Id.*

### 1. General Housewares

General Housewares manufactures pots and pans. In 1966 Ferro convinced General Housewares to discontinue being a self-smelter of frit. Between 1973 and 1977 Ferro's frit sales to General Housewares declined about 40%, from 5,660,000 pounds to 3,650,000 pounds. As Ferro's marketing

---

**2.** The requisite share of Ferro's Coatings Division overhead costs was allocated to determine average total cost.

**3.** *See* note 11, *infra*, tor "cost" definitions.

manager explained, in order to sell to a firm that was a self-smelter, as General Housewares had been, prices had to be very close to direct manufacturing costs. Although General Housewares had discontinued its production of frit, it could reestablish its smelting operation for less than $500,000. (III App. at 618). General Housewares was also very resistant to high frit prices because the domestic pot and pan business faced "tremendous foreign competition." (III App. at 617). Several American companies in the field—including at least one former Ferro customer—had gone out of business. Hommel had never sold any frit to General Housewares.

### 2. *Briggs*

Briggs, a bathtub manufacturer, had been a Ferro customer for many years. In 1974, Briggs moved its plant and made Hommel its frit supplier because Hommel frit could be applied at a lower, cost-saving temperature. Quality problems developed at the new Briggs plant—the enamel began to flake off the steel. The president of Briggs testified that in searching for a solution to this problem, he decided to purchase frit again from Ferro, although he did not discontinue purchasing the groundcoat from the same supplier. Ferro thereafter supplied half of Briggs's frit requirements. The frit sold to Briggs was identical to other frit sold by Ferro to other customers under a different label and at a higher price. It was later determined that the steel in the Briggs tubs was faulty, and Briggs considered resuming the purchase of frit from Hommel. Briggs demanded from Hommel a price competitive with Ferro's price, price protection for four, six or more months, and mentioned "something special" given to Briggs by Ferro—which turned out to be yearly price protection, assured by Ferro on a year-to-year basis. Hommel never offered any price protection and did not sell to Briggs after 1974.

### 3. *General Electric*

In April, 1976 Ferro extended a 5% discount to General Electric on certain frits if General Electric would buy 6,000,000 pounds of frit during 1976. (IV App. at 362–364). General Electric annually purchased approximately 15,000,000 pounds of frit and had obtained 4,500,000 pounds from Ferro in 1975. General Electric only ordered 3,800,000 pounds of frit in 1976. . Ferro unsuccessfully sought to rescind the 1976 discount and discontinued the discount for 1977 sales. Hommel sold no frit to General Electric in 1976 and 1977. Between 1973 and 1975 Hommel's sales to General Electric had averaged about 200,000 pounds a year. Hommel's loss of sales was due in large part, if not totally, to a change in coating materials made by two General Electric divisions. A Hommel employee did testify that he attempted to sell frits to General Electric but General Electric refused because of its arrangement with Ferro.

### C.

Hommel charged Ferro with attempting to monopolize the frit industry in violation of § 2 of the Sherman Act, 15 U.S.C. § 2 (1976), and with price discrimination in violation of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1976). On June 21, 1979 the district court denied Ferro's motion for summary judgment, accepting Hommel's argument that sales below *total* cost in some circumstances could permit an inference of predatory intent. *O. Hommel v. Ferro Corp.*, 472 F.Supp. 793 (W.D.Pa. 1979). The court relied on *Utah Pie v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) in arriving at its decision. Citing *Zenith Radio Corp. v. Matsushita Electric Indus. Co.*, 402 F.Supp. 244 (E.D.Pa.), *aff'd mem.*, 521 F.2d 1399 (3d Cir. 1975), it also ruled that Hommel could not introduce evidence demonstrating that Ferro had subsidized low frit prices in the United States through foreign sales.

The theory upon which the district court proceeded was explained in its charge to the jury:

> Where one seller sells below cost at a price less than direct cost plus an allocation for overhead, and a competing seller who is undercut is injured, the effect upon competition may be found to be traceable to such discrimination.

You should, of course, in this connection consider the instructions I have given you previously as to a declining industry.

(III App. at 920–21). The judge's previous instructions, given on the § 2 Sherman Act count, were:

Now, I charge you that, where there is competition among members of a relatively stable industry, particularly where one of the members manufactures only the product in question, in this case, frit, porcelain or glaze, each manufacturer should charge prices which, over a period of, say, four years, as in this case, should equal the total cost; and, if a price less than the total cost has been effected or charged by the manufacturer, then, such pricing may amount to predatory pricing; that is, pricing intended to injure a competitor. Of course, to continue to charge less than total cost in this period of time could force one or more of the competitors in the frit industry into bankruptcy. You must make all your costs or you are going to go broke.

. . . .

However, were you to find that the market for frit was declining during the years 1973 to 1977, and that the frit industry was a declining industry, and there was a large amount of unused capacity, then, the prices charged by manufacturers need only equal the average variable costs; that is, the direct manufacturing costs.

(III App. at 912–913).[4]

The jury found Ferro liable under the Robinson-Patman Act, *but not* under the Sherman Act. The jury calculated the damages to be $1,500,000, which the district court trebled to $4,500,000.[5]

On June 16, 1980, the district court, in a supplementary judgment order, awarded $483,350.48 in costs and attorney's fees to Hommel. Within ten days Ferro filed a motion for a judgment notwithstanding the verdict (it had moved for a directed verdict at the close of all the evidence,. III App. at 802), and a motion to alter the judgment so as to strike all damages. Ferro also filed a protective notice of appeal from the supplementary judgment order.

This court remanded the case for determination of all pending motions, jurisdiction of the appeal being retained. The district court found the post trial motions untimely and in the alternative denied them on the merits. It held that predatory intent could be found in Ferro's price discrimination and in Ferro's below total cost pricing. The present appeal resulted.

II.

In this case we are concerned with price discrimination at the primary or seller level. The Supreme Court wrote in *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 546, 80 S.Ct. 1267, 1272, 4 L.Ed.2d 1385 (1960) that "an independent and important goal of § 2(a) is to extend protection to competitors of the discriminating seller."

In relevant part, § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), reads:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, *and where the effect of such discrimination may be substantially to lessen competition or tend to*

---

4. Because of our disposition we have no occasion to address the charge as such, in this opinion.

5. Ferro filed a notice of appeal on February 4, 1980 from the jury verdict. That appeal was dismissed as being premature. *See* I App. at 132.

*create a monopoly in any line of commerce ....*[6]

(emphasis added).

The price discrimination referred to in Section 2(a) is merely a price difference. *Anheuser-Busch*, 363 U.S. at 549, 80 S.Ct. at 1274. A difference in prices charged by a seller to different customers, for the same product, constitutes price discrimination.

Price discrimination is not illegal *per se*. At the primary level, the plaintiff must show that the "effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce ...." *See Anheuser-Busch*, 363 U.S. at 542–43, 553, 80 S.Ct. at 1270–1271, 1276; 4 Van. Kalinowski, Antitrust Laws and Trade Regulation §§ 28.08, 29–01[4] (1980); *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); *Dean Milk Co. v. FTC*, 395 F.2d 696, 700 (7th Cir. 1968).[7]

In defining the scope of liability under the Robinson-Patman Act, the larger goals of antitrust law must be considered. The Supreme Court has cautioned us "that the Robinson-Patman Act should be construed consistently with broader policies of the antitrust laws." *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 80 n.13, 99 S.Ct.

6. Sections 2(a) and (b) in their entirety read:
   (a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods of quantities in which such commodities are to such purchasers sold or delivered: *Provided, however*, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: *And provided further*, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further*, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

   Burden of rebutting prima-facie case of discrimination

   (b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however*, That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

7. Section 2(b), see note 5 *supra*, does state that once price discrimination has been shown, the burden of rebutting the *prima facie* case lies with the defendant. Yet the term "price discrimination" in § 2(a) should not be considered synonymous with the term "price discrimination" in § 2(b). Otherwise a mere price differential would establish a *prima facie* case, a result clearly at odds with the construction of § 2(a). *See* FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 542–43, 80 S.Ct. 1267, 1270–1271, 4 L.Ed.2d 1385 (1960) (competitive harm is an element of a statutory violation).

925, 933, 59 L.Ed.2d 153 (1979). A court must be wary in imposing liability that would result in "price uniformity and rigidity." *Id.* at 80, 99 S.Ct. at 933; *Automatic Canteen Co. v. FTC,* 346 U.S. 61, 63, 73 S.Ct. 1017, 1019, 97 L.Ed. 1454 (1953). Secret price discrimination may be the only effective means for a firm to undercut published oligopolistic prices. *See* ABA Antitrust Section, Monograph No. 4, The Robinson-Patman Act: Policy and Law, Vol. I (1980) at 29. The Robinson-Patman Act is not to be used as a means to maintain artificially high prices. In defining the scope of Robinson-Patman liability, it must be remembered that vigorous price competition is a central goal of the antitrust laws. See *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714 (5th Cir. 1975) *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). "A focus on detrimental effects *on competition,* rather than a concern with individual *competitors,* is fundamental to a reconciliation of the Robinson-Patman Act with overall antitrust policies." F. Rowe, PRICE DISCRIMINATION UNDER THE ROBINSON–PATMAN ACT 130 (1962) (emphasis added).

■ There are two basic means of meeting the competitive injury requirement: (1) actual competitive injury shown by market analysis; and (2) predatory intent from which competitive injury may be inferred.

### A.

It is not disputed in this case that Ferro sold porcelain enamel frit to three customers below the prices at which it sold that frit to other customers. The central issue is whether these price differentials substantially lessened competition or tended to create a monopoly.

There was clearly no actual competitive damage in this case. The market share of Ferro dropped, while Hommel retained its market share. The market shares of Chicago-Vitreous and Pemco, both increased.

There was thus no evidence of any trend to monopolization—nor was there evidence of a less competitive industrial structure. There was no collapsing price structure, a condition found to constitute competitive harm in *Utah Pie v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). The speculative possibility that Hommel may have increased its sales had Ferro not engaged in price discrimination, cannot constitute harm to competition within the meaning of § 2(a). Even the most generous reading of the full record fails to disclose any competitive harm which Hommel suffered (its market share remaining stable, and its income and gross profits on the sale of porcelain enamel frit having increased between 1973 and 1977), much less "detrimental effects on competition."

### B.

■ Since there is no actual competitive harm that has been demonstrated in this case, our analysis must focus on whether there was evidence of Ferro's predatory intent from which competitive harm can be inferred. Predatory intent can be shown by two means: (a) by express evidence; and (b) by inference from "below-cost" pricing. This second means of proving predatory intent is known as the "double-inference" test. "From below-cost pricing, predatory intent is inferred; from the finding of predation, injury to competition is inferred." *Pacific Engineering & Prod. Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 798 (10th Cir.), *cert. denied,* 434 U.S. 977, 98 S.Ct. 543, 54 L.Ed.2d 472 (1977).

Initially, we must define predatory intent. The legislative history of the Clayton Act indicates that predatory intent is an intent to destroy a rival with the ultimate purpose of acquiring a monopoly in a particular locality. See H.R.Rep.No. 627, 63d Cong., 2d Sess. 8 (1914); S.Rep.No. 698, 63d Cong., 2d Sess. 2–4 (1914).[8]

---

8. Section 2 of the Clayton Act was of course later amended by the Robinson-Patman Act in 1936. The Robinson-Patman amendments, however, were principally concerned with secondary line competition. For a primary line case involving the issues presented to us here, the relevant legislative history is that of the Clayton Act.

More recent definitions of predatory intent focus on sacrificing present revenues with the purpose of achieving monopoly profits in the future. The Ninth Circuit has defined predatory pricing as pricing that indicates that a defendant was "foregoing present profits in order to create a market position in which it could charge enough to obtain supranormal profits and recoup its present losses." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1358 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). *See also Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 856 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); Areeda and Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 698 (1975). The concept of predation under the Robinson-Patman Act does not differ from the Sherman Act concept of predation.[9] *See generally* Areeda and Turner, 88 Harv.L.Rev. at 727.

■ Hommel claims that there was sufficient evidence of predatory intent upon which a jury could base liability. It points to what it considers to be direct evidence of predatory intent and asserts that the double inference test was correctly employed here—from the pricing below average total cost, the jury could infer predatory intent. We conclude, however, that there is no express evidence of predatory intent and that the use of any double inference test, on the facts of this case, was improper.

To be relevant, express evidence of predatory intent should demonstrate the alleged predator's intention of sacrificing present revenues with the hope of obtaining monopoly profits. Hommel's direct evidence of predatory intent stressed the secrecy of sales made by Ferro to Briggs, General Housewares, and General Electric. The prices of the frit that Ferro sold to these concerns were not published. Hommel emphasizes that identical frit was placed in different numbered bags and sold at different prices to other customers. This secrecy and possible deception, Hommel asserts, is evidence of predatory intent.

The secrecy here, however, cannot be viewed as evidence of predation. Keeping the "below-cost" sales to these three customers secret does not indicate that Ferro intended to drive Hommel out of business with the hope of obtaining monopoly profits. By keeping its prices secret, Ferro permitted Hommel to continue selling to Hommel's own customers at Hommel's higher prices. If Ferro had made known its lower prices, then Hommel and the other frit manufacturers would have had to meet those prices or risk losing customers.[10] Such conduct by Ferro would be more likely to injure competition than did the price discrimination here. (*See infra* for a discussion of across-the-board versus isolated, non-geographic price discrimination).

Moreover, the price discriminations here could not be accomplished without secrecy.

**9.** It could be maintained that the jury's findings of liability or the Robinson-Patman claim was inconsistent with its finding of no liability on the § 2 Sherman Act claim. In *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978), the court stated that for price differentials threatening primary line competition, § 2(a) of the Clayton Act as amended by the Robinson-Patman Act, has the same substantive content as § 2 of the Sherman Act, 15 U.S.C. § 2 (1976). The court consequently held that any error of the district court in directing a verdict for the defendant on the § 2 Sherman Act claim was harmless, because the jury had found for the defendant on the Robinson-Patman claims. *See also* Areeda and Turner, 88 Harv.L.Rev. at 727. This view is not unanimous. It has been suggested that a § 2 Sherman Act monopolization claim differs

from a § 2(a) Robinson-Patman claim, since § 2 of the Sherman Act requires a dangerous probability of success and a specific intent to control prices or destroy competition. *See generally* ABA Antitrust Section, Monograph No. 4, The Robinson-Patman Act: Policy and Law, Vol. I (1980). Since plaintiffs do not contend on appeal that the verdicts were inconsistent, and since our resolution of this case does not require us to meet this issue, we do not resolve whether Sherman Act liability is identical to Robinson-Patman liability for price differentials threatening primary line competition.

**10.** Of course, if Ferro made its prices public, there is a likelihood that Ferro would have been obliged to offer the lower prices to its other customers.

As Hommel admits, it is difficult to offer a product at a lower price to some favored customers without offering the same lower prices to other customers, or risking the loss of their business, when the less-favored customers learn of the discounts. Additionally, as mentioned earlier, secret discount pricing may be the only effective means to undercut an oligopolistic price. We thus fail to understand why price secrecy is indicative of predatory intent, nor has Hommel called our attention to any cases that would explain that relationship.

Hommel also considers it highly significant that an outside economic expert witness for Ferro testified that because of the continuing excess capacity in the frit industry, some frit firm might be forced to halt production in the future. The expert was of the opinion that if demand did not increase, it would be the most efficient use of economic resources for one of the firms to leave the frit business. Not only do we find it difficult to accept the testimony by a non-Ferro employee at trial in 1979, as revealing Ferro's intent in setting prices in 1973–1977, but we regard that testimony as bearing no relationship to predatory intent. Nor are we persuaded that any of the other evidence presented by Hommel, constituted proof of predatory intent.

Having determined that no express evidence of predatory intent is revealed by this record, we turn next to Hommel's argument that Ferro by pricing below its average cost [11] has exhibited the predatory intent which § 2(a) proscribes. Hommel, relying on *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) and Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284, 321–22 (1977), asserts that from the below-average cost pricing in this case, competitive harm can be inferred. Ferro counters, that since there is no actual competitive damage, none can be inferred, and in the alternative, that competitive harm can only be inferred from prices below marginal cost or average variable cost.[12] We agree with Ferro that on the

---

11. "Average cost is the sum of fixed cost and total variable cost divided by output." Areeda and Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 700 (1975). Fixed costs are those which *do not* vary with changes in output, and variable costs are costs which *do* vary with changes in output. *Id.* Variable costs typically include such items as materials, fuel, labor directly used to produce the product, repair and maintenance, etc. Average variable cost is the sum of all variable costs divided by output and is by definition lower than average cost.

12. Marginal cost is the increment to total cost that results from producing an additional increment of output. It is a function solely of variable costs, since fixed costs, by definition, are costs unaffected by changes in output. Marginal cost usually decreases over low levels of output and increases as production approaches plant capacity. *Id.*

Areeda and Turner conclude that a price above reasonably anticipated short-run marginal cost is non-predatory. *Id.* at 733; III P. Areeda & D. Turner, Antitrust Law, § 711d at 153 (1978). Areeda and Turner deem pricing above marginal cost to be non-predatory because "[i]f a monopolist produces to a point where price equals marginal cost, only less efficient firms will suffer larger losses per unit of input . . ." Areeda & Turner, 88 Harv.L.Rev. at 711. Marginal cost pricing also maximizes social welfare by avoiding the "wasteful idling of current productive resources." Areeda and Turner, *Williamson on Predatory Pricing*, 87 Yale L.J. 1337, 1339 (1978). *See also Northeastern Telephone Co. v. American Telephone and Telegraph Co.*, 651 F.2d 76, at 87–88 (2d Cir. 1981); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 431 (7th Cir. 1980). Where there is perfect competition a firm maximizes profits by continuing production until marginal cost equals the market price. Areeda and Turner, 88 Harv.L.Rev. at 702. For a monopolist, however, an increase in output will reduce the market price and thus, "the incremental [marginal] revenue to the monopolist from selling an additional unit is the lower price received for that unit, minus the revenue lost for selling all other units at the lower price." *Id.* at 703. A monopolist maximizes profit when marginal revenue equals marginal cost. *Id.* at 703, n.19.

Areeda and Turner use average variable cost as a substitute for marginal cost because average variable cost is easier to ascertain. When average variable cost is constant, it is equal to marginal cost, when average variable cost is declining, it is greater than marginal cost, and when average variable cost is increasing, it is less than the marginal cost. *Id.* at 718. Areeda and Turner would have a court presume that a price at or above average variable cost is

facts of this case, the jury should not have been permitted to infer predatory intent from the evidence of Ferro's "below-cost" pricing.

The main evil at which § 2 of the Clayton Act was aimed was geographic price discrimination. Congress feared that nationwide concerns would lower costs in one region with the intent of destroying local competitors thereby hoping to acquire a monopoly in that locality. *See* S.Rep.No. 698, 63d Cong., 2d Sess. 2–4 (1914); H.R. Rep.No. 627, 63d Cong., 2d Sess. 8 (1914). The House Report stated:

> Section 2 of the bill ... is expressly designed with the view of correcting and forbidding a common and widespread unfair trade practice whereby certain great corporations and also certain smaller concerns which seek to secure a monopoly in trade and commerce by aping the methods of the great corporations, have heretofore endeavored to destroy competition and render unprofitable the business of competitors by selling their goods, wares, and merchandise at a less price in the particular communities where their rivals are engaged in business than at other places throughout the country.... In the past it has been a most common practice of great and powerful combinations engaged in commerce—notably the Standard Oil Co., and the American Tobacco Co., and others of less notoriety, but of great influence—to lower prices of their commodities, oftentimes below the cost of production in certain communities and sections where they had competition, with the intent to destroy and make unprofitable the business of their competitors, and with the ultimate purpose in view of thereby acquiring a monopoly in the particular locality or section in which the discriminating price is made....

*Id.* The Senate bill expressed similar concerns. Congress believed that price discrimination in one locality would be financed by higher prices elsewhere. "Every concern that engages in this evil practice must of necessity recoup its losses in the particular communities or sections where their commodities are sold below cost or without a fair profit by raising the price of the same class of commodities above their fair market value in other sections or communities." S.Rep. at 3.[13] Whatever the merits of this recoupment theory, it is clear that it only applies in a geographic price discrimination setting. The theory presupposes that there is a geographic market for the commodity where the concern engaging in such "evil" practices faces no price competition.

The implicit congressional belief that non-geographic price discrimination does not present the same threat of economic harm at the primary level is shared by current commentators. Areeda and Turner would not even prohibit selective price-cutting:

> 2. *Price Discrimination in the Same Geographic Market.—*
>
> If, as we have contended, a monopolist should be permitted to make a general price reduction so long as his price equals or exceeds marginal cost, we are unable to see a persuasive case for prohibiting selective price-cutting to retain or obtain particular customers. Selective price-cutting cannot possibly be more harmful to small competitors than a general price reduction to the same level.[54] And since any additional sale at a price at or above marginal cost does not decrease shortrun net returns, the necessary element of predation is missing.

---

[54] Selective price-cutting might, however, be more likely to occur than general price-cuts, since the monopolist's losses on selective reductions would be smaller.

Areeda & Turner, 88 Harv.L.Rev. at 725–26. *See also* Van Kalinowski, *supra* at § 29.04, 29–94–95; Note, *Competitive Injury*

---

lawful. P. Areeda and D. Turner, Antitrust Law, § 711d at 154 (1978).

**13.** As noted earlier, *see* note 8 *supra*, the 1936 Robinson-Patman amendments were almost entirely concerned with the effects of price discrimination at the secondary level.

*Under the Robinson-Patman Act,* 74 Harv. L.Rev. 1597, 1610–11 (1961).

The theoretical evil that lies behind predatory pricing is that a large firm will engage in the illegal price-cutting tactics which Congress feared, thereby forcing smaller concerns also to cut their price, or risk losing all their customers to the initial price cutter.[14] If a price-cutter offers a lower price to only a few set number of firms, then its price schedule cannot attract customers from its competitors. Those competitors will be able to retain their customers, because their customers will not be able to receive the discount price given by the price-cutter. Thus, the competitors will not be forced to lower their prices to meet the price-cutter. This type of price discrimination would be difficult to maintain without secrecy because otherwise disfavored customers of the price-cutter might demand equal treatment. This secrecy, as explained earlier, helps competitors to retain their customers without meeting the price-cutter's price. Unless a customer knows of the lower predatory price, and can buy at that price, price discrimination will not likely have an adverse effect on competition.

■ Moreover, an additional sale at above marginal cost will increase short run net returns. A seller faced with a choice of making a sale at above marginal cost but below total cost, or foregoing the sale, will choose to make the sale. Such a profit maximizing sale cannot be indicative of predatory intent. We are thus impelled to conclude that in a non-geographic selective discriminatory pricing case when actual competitive harm has not been shown, Robinson-Patman primary line liability cannot be imposed merely upon evidence of selective below-average cost pricing.

*Utah Pie* is entirely consistent with our analysis. In *Utah Pie,* national manufacturers of frozen dessert pies challenged the price of a small (18 employees, family operated), local dessert pie manufacturer, Utah Pie, by lowering prices in the locality where Utah Pie sold its products. The prices set by the national pie manufacturers were all below their prices in other regions, and there was evidence that many of the prices were below "cost"—a term which the Court, at one point, apparently defined as "less than . . . direct cost plus an allocation for overhead." *Utah Pie,* 386 U.S. at 698, 87 S.Ct. at 1333. The price of frozen pies, including those of Utah Pie, fell dramatically. Utah Pie's share of the local market fell from 66.5% to 45.3%. Utah Pie's sales, however, nearly tripled and its net income increased.

Upon this evidence, the Supreme Court, reversing the Court of Appeals, reinstated the jury's finding of liability against the national manufacturers. The Court held that the competitive harm requirement had been satisfied because: (1) The "drastically declining price structure" constituted actual competitive harm. *Id.* at 703, 87 S.Ct. at 1336. (2) There was evidence of predatory intent which bore "on the likelihood of injury to competition." *Id.* at 702, 87 S.Ct. at 1335 (footnote omitted). This predatory intent was shown by the defendants' charging lower prices in the Salt Lake City market, and apparently, though it is not made explicit, by pricing below average cost.

*Utah Pie* thus does not stand for the proposition that in a case such as the present one, which is a selective, non-geographic price discrimination case, pricing below average cost is sufficient evidence upon which a jury can infer competitive harm when no actual competitive harm has been shown. The Supreme Court did not indicate that the competitive harm requirement could be satisfied merely by a showing of below-average cost pricing. It only stated that "the existence of predatory intent might bear on the likelihood of injury to competition," *id.* (footnote omitted), in the context of a case where it also found actual competitive harm. When inferring predatory intent from "below-cost" pricing, the Court also emphasized that the defend-

---

**14.** The predator must have the capacity to meet the new demand. Areeda & Turner, 88 Harv.L.Rev. at 718.

ants sold pies in the Salt Lake City market at a lower price than elsewhere in the United States. *Id.* at 690, 694, 698, 701, 87 S.Ct. at 1329, 1331, 1333, 1335. Therefore, even if *Utah Pie* would support the theory that predatory intent, and hence competitive harm, could be shown merely by below-average cost pricing, such a theory would only apply in a geographic price discrimination case.

The Williamson cost theory [15] relied on by Hommel and apparently by the district court, does not convince us that in a selective price discrimination case, predatory intent can be inferred from below cost pricing. Williamson would have a court find pricing to be predatory if it is below average cost over a long term when there is a loose oligopoly and when demand is not declining. However, we do not read his analysis to extend to the selective price discrimination context presented in this case. Whatever the merits of the Williamson theory as it pertains to across-the-board predatory pricing, we have difficulty in relating that theory to the present circumstances, which involve no more than lower pricing for a limited number of customers. Indeed, although Williamson responds to the Areeda and Turner article, Williamson's analysis does not address that aspect of Areeda and Turner which would free selective price discrimination from regulation. Thus, we are forced to conclude that reliance on the Williamson formulation would be misplaced in a case such as this one where we are faced with selective price discrimination.[16]

■ Although we have discussed various economic theories as they have been urged upon us by the parties, we need not choose among them to conclude that in this case insufficient evidence existed to warrant submission of the Robinson-Patman claim to the jury. While we are inclined to accept the basic premise of the Areeda and Turner thesis that predatory intent may not be inferred from sales at or above average variable cost, in light of the issue that we must resolve here and the record which presents it, we need not declare our adherence to that or any other economic theory proposed. The record here discloses that Ferro's discrimination in prices caused no competitive harm. The selective price discrimination practiced by Ferro resulted in no gain in Ferro's market share. Indeed, between 1973 and 1977, Ferro's share of the market decreased. During that same period, Hommel retained its share of the market and its overall economic position improved. No express evidence of predatory intent appears in the record, and Hommel thus sought to draw inferences of predatory intent from Ferro's pricing, relying on Robinson-Patman cases which involved not selective price discrimination, but geographic price discrimination. Yet, here the record reveals that Ferro's price discrimination was dispersed throughout the national market. Indeed, the price discriminations which are the focal point of Hommel's action, were limited to three customers and affected only 5% of Ferro's national sales.

In such circumstances we have grave reservations whether any sales priced below

---

15. Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284 (1977).

16. Williamson asserts that prices must be remunerative, foreseeing that if over the long run, a firm keeps its price of a product below average cost, it will not recover all its expenses. *Id.* at 321–22. This, of course, need not be the result in selective price discrimination. There, even though below-average cost sales to a select number of customers may result in "losses" on those sales, the above-average cost sales made during the same relative period can result in a full recovery of costs.

Williamson also employs an average cost test because of the hypothetical situation where firms in the same industry have different technologies. One capital intensive firm may have high fixed costs, and low variable costs, while its competitors may have low fixed costs and high variable costs. The capital intensive firm may not be more efficient than its competitors, but may engage in predatory pricing (and drive out its competitors) by pricing above its average variable cost but below the average variable cost of its competitors. *Id.* at 321. *See also* R. Posner, Antitrust Law 191–93 (1976). We fail to understand how this justification applies when firms share the same technology, such as in this case.

*any* cost formulation could, without more, be deemed indicative of predatory intent because our review of the record shows it to be barren of any substantial lessening of competition or any tendency to create a monopoly [17] caused by Ferro's discriminatory pricing.

Thus, without relation to any particular cost formula, we are satisfied that no liability under Robinson-Patman was incurred by Ferro. If, however, we were to look to the Areeda and Turner thesis to which we have been attracted, it is evident that our conclusion in this respect would be buttressed, providing, of course, that Areeda and Turner would even apply their theory to a selective price discrimination case. 88 Harv.L. Rev. at 725–26. We observe that the prices at which Ferro sold frit to General Housewares, Briggs and General Electric were all above, not below, average variable cost, which under the analysis of Areeda and Turner could not lead to any inference of predatory pricing.

We conclude therefore, that "as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969).

### III.

█ Hommel contends that even if we find the evidence to be insufficient for a jury to find liability, we cannot enter judgment for Ferro because Ferro moved for judgment notwithstanding the verdict out of time. According to Hommel, in this circumstance, we can only remand for a new trial. *See Johnson v. New York, New Haven & Hartford R.R.*, 344 U.S. 48, 54, 73 S.Ct. 125, 128, 97 L.Ed. 77 (1952). Rule 50(b) of the Federal Rules of Civil Procedure provides:

> No later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict.

Ferro moved for a judgment notwithstanding the verdict within ten days of the district court's Supplementary Judgment Order of June 16, 1980, which set the amount of attorneys' fees. It did not move for an NOV judgment within ten days of the jury verdict and the entry of judgment thereon.

We agree with both parties that "judgment" means final judgment. Rule 54 defines judgment as used in the Federal Rules of Civil Procedure as "includ[ing] a decree and any order from which an appeal lies." Rule 4(a)(4) of the Federal Rules of Appellate Procedure assumes that an NOV motion will be made after final judgment:

> (4) If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above. No additional fees shall be required for such filing.

Rule 50(b) had been amended in 1963 to provide that the motion for a judgment NOV should be made within ten days of the entry of judgment, rather than ten days after the reception of the verdict, so as to be consistent with Rules 52(b) and 59(b). *See* Notes of Advisory Committee on Rule 50(b), 18 U.S.C.A. at 376 (1963). The First Circuit has held that "judgment" in Rule 59(b) means final judgment. *Warner v. Rossignol*, 513 F.2d 678, 684 n.3 (1st Cir.

---

**17.** No evidence exists that Ferro's pricing tended to create a monopoly. Indeed the jury decided otherwise by finding for Ferro on the § 2 Sherman Act claim.

1975). We thus conclude that entry of judgment should be construed as entry of final judgment.

▮▮▮ A judgment is not final until attorneys' fees have been determined. *Richerson v. Jones*, 551 F.2d 918 (3d Cir. 1977). Hommel argues that *Richerson* was overruled by *De Long Corp. v. Raymond International, Inc.*, 622 F.2d 1135, 1138–39 n.3 (3d Cir. 1980). Yet a panel of this court cannot overrule a prior panel precedent. United States Court of Appeals for the Third Circuit, Internal Operating Procedures, Ch. VIII, § C (1978). To the extent that it is inconsistent with *Richerson, De Long* must be deemed without effect.[18] Since this judgment was not final until the order of June 16, 1980, which established attorneys' fees, Ferro's NOV motion was timely, and judgment for Ferro may thus be entered.

### IV.

On the record before us, Ferro's below-average cost pricing to three of its customers has caused no competitive harm within the meaning of 15 U.S.C. § 13 to the porcelain frit industry. Nor does the record disclose explicit evidence of any predatory intent from which competitive harm could be inferred. All Hommel has shown is selective below-average cost pricing to three customers of Ferro. This evidence falls far short of establishing that Ferro was sacrificing short-term profits in the hope that it would recoup monopoly profits. If, on this record, we were to sustain Robinson-Patman liability, we would be encouraging the very price rigidity and uniformity which the Supreme Court warned us against in *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 80, 99 S.Ct. 925, 933, 59 L.Ed.2d 153 (1979). Our holding would thus run counter to the broader policies of the antitrust laws. *Id.* at 80, n.13, 99 S.Ct. at 933. Having concluded that evidence of competitive harm and of predatory intent is lacking,

we will reverse the district court and direct that judgment be entered for Ferro.

GIBBONS, Circuit Judge, dissenting:

Ferro Corporation appeals from an order denying its motion for a judgment notwithstanding the verdict returned by a jury in a suit by O. Hommel Company for damages resulting from price discrimination in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. 15 U.S.C. § 13(a). The standard for granting such a motion is the same as that for the grant of a directed verdict. For that purpose there must be either a complete absence of proof on an issue material to the cause of action relied upon, or a complete absence of controverted fact issues on which reasonable men could differ. The motion may be granted only if, without weighing the credibility of the evidence, there can be but one reasonable conclusion. Moreover, it is not sufficient for the grant of a motion that the evidence be undisputed, so long as it is rationally possible to draw conflicting inferences from it on the material fact in issue. *Fireman's Fund Insurance Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178–79 (3d Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); *Neville Chemical Company v. Union Carbide Corporation*, 422 F.2d 1205 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). In considering the motion, both the trial court and this court must view the evidence in the light most favorable to the party which obtained the verdict, and must give to that party the benefit of all inferences supporting it which the evidence permits, even though contrary inferences might reasonably be drawn. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). This standard of review, the narrowest in federal appellate practice, is required by the seventh amendment. *See Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed.

---

**18.** We also note that at the time the jury handed down its verdict, *De Long* had not been decided.

1458 (1943). In applying it we must determine, first, what are the material elements of the cause of action on which the jury returned a verdict, and second, whether from the stipulated facts and the evidence a reasonable jury could have found them.

A plaintiff seeking damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, must establish that the defendant violated one of the antitrust laws and must show damage to his business or property caused by that violation. Ferro contends that there is no evidence from which a jury could find either violation or injury to Hommel's business or property. On violation, it contends further, that even if there is evidence from which the jury could infer the elements of a Robinson-Patman Act violation which were set out in the court's charge, the charge was erroneous as a matter of law. Reviewing the record by the appropriate standard of review, I am not persuaded that there is no evidence from which the jury could find the material elements of a violation as defined in the court's instruction. Moreover, that instruction is consistent with the interpretation of Section 2(a) announced by the Supreme Court. Finally, there is evidence from which the jury could find that Hommel lost profits as a result of Ferro's sales below cost to selected customers. Thus I would affirm.

### I.

The stipulated facts establish that both Ferro and Hommel are manufacturers of an industrial raw material called frit, an ingredient in the enamel finish of bathtubs, lavatories, and major consumer appliances such as stoves, washing machines and refrigerators. This raw material is processed by the manufacturers of those products into a porcelain enamel "slip," which is applied as a coating, dried, and fused by heat to produce a porcelain enamel finish. Frit is also the basic raw material for the glaze coating on pottery products such as dishes, and both Hommel and Ferro manufacture frit for this use. Sales and shipments of both types of frit are in interstate commerce. Ferro, a multi-national, diversified manufacturer, has 65 plants throughout the world, and manufactures frit at 20 of them. It manufactures frit in the United States at plants in Cleveland, Nashville, and Los Angeles. Hommel's sole business is the manufacture and sale of frit and other materials needed to produce a glaze product. It has one plant in Carnegie, Pennsylvania. Sales involved in this case were, with one exception, to manufacturers of porcelain enamel. Five manufacturers in the United States produce frit for porcelain enamel, and their respective shares of total frit sales for that use were:

| Year | Ferro | Chicago Vitreous | Pemco | Hommel | Ingraham-Richardson |
|------|-------|------------------|-------|--------|---------------------|
| 1973 | 42% | 23% | 21% | 7% | 7% |
| 1974 | 43% | 23% | 22% | 6% | 6% |
| 1975 | 42% | 25% | 22% | 6% | 5% |
| 1976 | 41% | 25% | 25% | 6% | 4% |
| 1977 | 40% | 24% | 24% | 7% | 5% |

The sales of porcelain enamel frit about which Hommel complains were made to Briggs Manufacturing Company, a manufacturer of steel stampings for use at Briggs' bathtub manufacturing plant in Knoxville, Tennessee, to General Housewares Corporation for use at its Terre Haute, Indiana steel pot and pan plant, and to General Electric Co. for use at its Louisville, Kentucky large appliance plant. Two or more of the porcelain enamel frit manufacturers listed above competed for sales to these three plants. The sales of frit for pottery about which Hommel complains were made to Socio Pottery Company for use in its dinnerware plant in Socio, Ohio. Ferro and Hommel competed for sales to that plant. Total sales of frit for porcelain enamel by the five American manufacturers of that product, in pounds, were:

| 1973 | 180,188 |
|------|---------|
| 1974 | 144,243 |
| 1975 | 101,484 |
| 1976 | 125,936 |
| 1977 | 134,397 |

During those years Ferro sold frit to each of the plants listed above at prices below its published price list and below the price charged to other customers for frit of like grade or quality. It was industry custom, followed by Hommel, to extend a freight allowance to equalize the freight cost to the

customer's plant with that from the nearest competitor's plant. The difference in freight from Carnegie, Pennsylvania, to the Briggs plant in Knoxville, and from Ferro's Nashville plant in 1974 was $.69 per hundred pounds. The difference in freight from Carnegie to General Electric's Louisville plant and from Ferro's Nashville plant in 1976 was $.96. The difference in freight shipped to General Housewares' Terre Haute, Indiana plant and the Carnegie and Nashville plants was $.30 in 1973 through 1975; $.35 in 1976 and $.38 in 1977. Thus in the three instances in which sales were made to industrial customers at prices below those charged others for like grade or quality, the favored plant was one as to which Ferro's Nashville plant had some competitive advantage over Hommel by virtue of proximity.

In addition to the stipulated facts almost two hundred exhibits were received in evidence and the jury heard the testimony of fifteen witnesses, including an economist expert for each side. From the stipulated facts and these evidentiary sources the jury could find that Ferro is a large diversified company with assets over $250,000,000 and a net worth of $150,000,000, and an average annual profit of $23,000,000. From this deep pocket it was in a position to sustain sales of one product at less than total cost over a long period. Hommel has one plant, a net worth of $2,500,000, annual sales of $7,000,000, and in the five years involved operated at an annual loss of $7,000. Thus it was in no position to make sales below total cost for any protracted period. Ferro selected three plants for the business of which its Nashville frit manufacturing plant was a logical supplier, to which it made sales over a number of years at prices not only below its published prices and below the price charged to others for products of like grade or quality, but also below its average total cost for the production of the product. Ferro maintains, and Hommel disputes, that the evidence is that all the prices in question were above average variable costs. The difference between them is over what should be included in the term average variable costs. From the evidence

the jury could conclude that Ferro's calculation of average variable cost included direct manufacturing cost, but excluded the cost of salesman's bonus for procuring the sale, the cost of technical service to Briggs and General Electric, the expenses of the sales representative who serviced General Housewares, the cost of additional workmen's compensation insurance premiums and unemployment insurance contributions on additional payroll, and the cost of invoicing, bookkeeping, and collecting of the three accounts. Assuming the jury found that all these items were excluded from Ferro's calculation of average variable cost, it could conclude that Ferro's prices were below what would recapture all fixed costs and several variable costs, although above its average direct manufacturing costs. The jury could find from the evidence that the discounts were not occasional or sporadic incidents in response to competition, but were given to the favored customers over a period of four years. They could find that the discounts were kept secret and could reasonably infer that the purpose of the secrecy was so that owners of plants using frit as a raw material located elsewhere would not learn of them, and demand equal treatment. Moreover they could reasonably infer that the three plants chosen for below cost pricing were plants for which, because of their respective locations Ferro's Nashville plant and Hommel's Carnegie plant were the most logical competitive suppliers. There was no "smoking gun" letter, saying that the purpose of the below cost pricing was for the express intention of excluding Hommel from competition at the three locations, but from the totality of the evidence the jury could infer that this was Ferro's purpose, and thus we must do so. Finally, from the evidence the jury could find that, but for Ferro's sales below cost, Hommel would in the years in question have retained or obtained a share of the market represented by each of the three plants.

Thus the fact pattern before the jury was that of an industry in which there were five established rivals, two of which had plants which by reason of location could economi-

cally supply frit users located at Knoxville, Louisville and Terre Haute. Sales industry-wide declined from 1973 through 1975, but turned upward in 1976. Although there was evidence from which a conclusion of declining demand and permanent excess capacity could be reached, the jury could reasonably conclude that the downturn was the temporary result of the general economy, and that the upturn in 1976 and 1977 suggested an industry situation of relatively stable demand. Either inference would, on the entire evidence, be rationally possible, and thus we must assume that the jury made the inference which, in light of the charge, supports the verdict.

The jury returned a special verdict, answering affirmatively the questions "[h]as the defendant violated ... § 2(a) of the Clayton Act," and "[h]as the defendants' violation ... been the proximate cause of any injury to the plaintiff's business." Ferro's motion for judgment notwithstanding the verdict requires that we consider whether those answers have any factual support. Since on a motion for judgment notwithstanding the verdict the court may consider whether a new trial should be granted, Fed.R.Civ.P. 50(b), (d), we must also consider the propriety of the court's charge.

## II.

Before turning to the charge, it is worth noting that in rejecting Ferro's pre-trial motion for summary judgment the trial court disclosed his understanding of the elements of a Section 2(a) violation.

In order to establish a prima facie Robinson-Patman violation, plaintiff must show 1) that one or more of the purchases involved is "in commerce," 2) that there has been a discrimination in price between purchasers of products of like grade and quality, and 3) that the effect of the price discrimination "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination...." See *William Inglis & Sons v. ITT Continental Baking Co.*, 461 F.Supp. 410 (N.D.Cal.1978). Where there is no direct evidence of an attempt to monopolize under Section 2 of the Sherman Act or a likelihood of injury to competition under Robinson-Patman, these showings may be inferred from a showing of predatory intent, and this intent, under both Acts, may be established by proof of predatory pricing. *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967)....

The major issue in dispute in this case concerns the nature of the predatory pricing evidence which will be admissible at trial to permit the inference of predatory intent. Plaintiff contends that evidence of sales below total cost is permissible while defendant argues that sales below marginal cost, or at least variable cost,[1] is required before a jury may infer predatory intent.

---

[1] Marginal cost is the cost of manufacturing "the last unit." Variable costs are costs that vary with changes in output, as distinguished from "fixed costs," which remain constant despite changes in output. The use of variable cost as a substitute for marginal cost is not an issue in this case.

*O. Hommel Co. v. Ferro Corp.*, 472 F.Supp. 793, 795 (W.D.Pa.1979). Rejecting Ferro's contention that evidence of sales below total cost should be excluded, and summary judgment entered, the court ruled:

In some circumstances, of course, sales below total cost may enhance competition even though a particular competitor may be injured. Such a result would be consistent with the goal of the antitrust laws. In other circumstances, however, sales below total cost could permit an inference of monopolistic or predatory intent. A determination of these issues cannot be made on a motion for summary judgment; it must await a full trial on the merits.

472 F.Supp. at 796. Thus even at pretrial it was Ferro's contention that as a matter of law no sales price above variable cost could ever in any circumstances support a finding

of a Section 2(a) violation. That position, which it also advanced on its motion for judgment notwithstanding the verdict, would if accepted entitle Ferro to a judgment in its favor even if there was other independent evidence from which predatory intent could be inferred.[1] It was clear throughout the case that price discriminations were made available to the Louisville, Knoxville and Terre Haute customers and there was no real dispute over whether the sales prices to those plants were below total cost. The main disputed issue in the case was that identified in the ruling on the motion for summary judgment; whether from the totality of the circumstances the jury should be permitted to infer that the discriminations were made with predatory intent. Such an intention would, as the trial court noted, support the additional inference of likelihood of injury to competition.

Although in Point II of its brief on appeal Ferro urges that it is entitled to judgment as a matter of law because Hommel's percentage share of the total frit market did not decline in the years in question, that was not the ground advanced in its motion for judgment notwithstanding the verdict. Both pre-trial, when it moved for summary judgment, and post-trial, when it moved for judgment notwithstanding the verdict, Ferro contended that because the contested prices were above its average direct cost of production it was entitled to a verdict as a matter of law.[2] (III A, 802). Ferro's legal

position was that the court need look no further. Additional evidence from which the jury might infer predatory intent could, on this theory, be disregarded.

The court in its charge rejected the contention that sales above average direct manufacturing costs must in all circumstances as a matter of law be immune from Robinson-Patman liability in a primary line competition case. Instead, it charged:

Now, I charge you that, where there is competition among members of a relatively stable industry, particularly where one of the members manufactures only the product in question, in this case, frit, porcelain or glaze, each manufacturer should charge prices which, over a period of, say, four years, as in this case, should equal the total cost; and, if a price less than the total cost has been effected or charged by the manufacturer, then, such pricing may amount to predatory pricing; that is, pricing intended to injure a competitor. Of course, to continue to charge less than total cost in this period of time could force one or more of the competitors in the frit industry into bankruptcy. You must make all your costs or you are going to go broke.

(III A, 912). This part of the charge described what, from the stipulated facts and the evidence, the jury could have found: that the industry was relatively stable, and that one manufacturer in it, Hommel, was in no financial condition to sell below total

---

1. Actually the grounds advanced in support of the motion refined Ferro's position somewhat. They included:

   (a) The proofs, taken in the light most favorable to the plaintiff, O. Hommel Company, establish as a matter of law, that defendant, in pricing its product above its average variable cost *to produce such product*, did not injure, lessen or adversely affect competition within the frit industry or otherwise violate any of the standards set down by the Robinson-Patman Amendment to the Clayton Act.
   (b) Based upon the proofs adduced at trial, taken in the light most favorable to the plaintiff, the jury could not reasonably conclude that defendant sold either porcelain enamel or pottery frit in the relevant market between 1973 and 1977 at a price below its average variable cost *to produce*.

(I A, 163–64). (Emphasis supplied).

Thus it sought a ruling that in all circumstances sales at prices above average direct manufacturing costs, excluding other variable costs, were in a primary line Robinson-Patman case as a matter of law permissible. As noted in the text, there was evidence from which the jury could infer that some variable costs were excluded from Ferro's calculation of its average variable cost to produce.

2. Arguably the contention about Hommel's steady market share was advanced at least cryptically in the motion for a directed verdict (III A, 517). The contention was not made to or discussed by the trial court in the post-trial proceeding. (I A, 195–210).

cost over a period of years. If the jury so found, the court charged, it could, but was not required to, infer that the price differentials were intended to injure Hommel as a competitor.

On the other hand, the court continued, there were circumstances in which the inference of predatory intent was in its view impermissible.

> However, were you to find that the market for frit was declining during the years 1973 to 1977, and that the frit industry was a declining industry, and there was a large amount of unused capacity, then, the prices charged by manufacturers need only equal the average variable costs; that is, the direct manufacturing costs.

(III A, 913). This part of the charge also described what, from conflicting evidence, the jury could have found: that the industry was in a permanent decline with a large unused capacity. In that case, the court made clear, the inference of predatory intent could not be made so long as sales were made, even over a long period, at less than total but more than average direct manufacturing costs. This part of the charge is actually more favorable to the defendant than any formulation of a marginal cost floor for predatory pricing proposed in the secondary literature on the Robinson-Patman Act, for even the Areeda and Turner formulation is generally considered to refer to short run rather than long run pricing below fixed but above marginal costs. *See* O. E. Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284, 322 n. 88 (1977). That question need not be decided, however, for we must assume that the jury followed the instruction that if it found the industry to be a declining one, it could not infer predatory intent from sales above average direct manufacturing costs.

The charge limited the area of inquiry on predatory intent still further. Even if the jury found a relatively stable industry, or sales below average direct manufacturing costs, it must consider other factors:

In determining whether such conduct was predatory—preying upon others, that is—or merely lawful competition, you may consider whether or not the Defendant enjoyed a dominant position in the frit market at the time, or whether there were healthy, active competitors for the business. You may consider whether there was excess production capacity among the various competitors in the frit business, making price competition naturally more aggressive, since it is obvious that, in a declining business, it is better for a plant to produce some product and sell it at a price that covers at least its direct manufacturing expenses, than to allow its machinery and workmen to stand around idle.

You may consider whether or not there were barriers to potential new competitors entering the frit business in competition with Defendant and Plaintiff. You should consider these and all the other circumstances in the case in determining whether the price at which Ferro sold frit to some of its customers, as testified in this case, was predatory or not.

(III A, 913–14). Thus the court charged that the jury could, but certainly did not have to, infer a predatory intention only if (1) in a stable industry Ferro sold below total cost over a long period, or (2) in a declining industry it sold below average direct manufacturing costs. There was evidence from which the jury could legitimately draw either inference. The upturn in sales in 1976 and 1977 supports an inference of long-term reasonable stability. The evidence that variable additional labor costs for workmen's compensation premiums and unemployment insurance contributions was not taken into account casts doubt on Ferro's contention that it recaptured all variable manufacturing costs.

The court charged the jury to "consider whether or not geographic discriminations were employed by the Defendant for predatory ends." If the jury so found, he continued, "[t]hat is evidence from which you may properly conclude that the discriminatory prices may have had the required effect upon competition." (III A, 919). This in-

struction was qualified still further by an instruction:

> The Act requires that [sic] a likelihood of adverse competitive impact attributable to unlawful price discrimination either in the form of one, a substantial lessening of competition, or, two, a tendency to create a monopoly.

(III A, 919). In considering the likelihood of adverse competitive impact even from intentionally predatory pricing, the jury was instructed:

> You should, of course, in this connection consider the instructions I have given you previously as to a declining industry. I must emphasize that the Act is concerned with the effect of price discrimination upon the state of competition and not with its effect upon an individual competitor as such. It has been said that the injury center is the vigor of competition in the marketplace rather than a hardship to the individual businessman. The Act is primarily concerned with the health of the competitive process, not with the individual competitor who must sink or swim in a competitive enterprise system. The crippling of a competitor by price discrimination is not an event of independent significance, but is relevant as a necessary incident of the injury to competition generally. For the purposes of the Act it is only against the background of the competitive structure that the fate of the individual competitor is significant. If the competitors are so numerous that the elimination of one will only have an infinitesimal effect upon the overall business in the area, then competition has not been injured. On the other hand, where there are relatively few competitors in an industry, the injury to one may shatter the competitive structure and may lead to—may tend to lead to monopoly.

(III A, 921). Clearly there was evidence from which the jury could conclude the three plants chosen for discriminatory pricing, Briggs in Knoxville, General Electric in Louisville, and General Housewares in Terre Haute, were selected in order to exclude Hommel from those plants, that Hommel was in no position to compete for business by selling, long term, below cost, that Hommel had geographic disadvantages in competing for business in plants more distant from Carnegie, and that its loss in a five company industry would be likely to have an adverse effect on competition in that industry. There was evidence from which a different conclusion might be drawn, but we must make that which supports the verdict.

The only objection which Ferro makes to the charge is to that part of it which permitted the jury to find that sales below total costs, but above average direct manufacturing costs, continued over a period of time, supported an inference of predatory intention. Appellant's Brief p. 42–46. It describes this charge as unprecedented. That is hardly so, for in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 698, 87 S.Ct. 1326, 1333, 18 L.Ed.2d 406 (1967), the Supreme Court, reversing a Tenth Circuit decision which set aside a jury verdict in a primary line competition case, noted that the offending price was less than defendant's "direct cost plus an allocation for overhead." The charge as given was more favorable than that which the *Utah Pie* court appears to authorize, for it required the additional findings of reasonable market stability and continuation over time. The precedent on which Ferro relies is a secondary one, P. Areeda and D. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975). This article first suggested the analysis which since the beginning of the case Ferro has insisted is required as a matter of law. As the trial judge observed,

> Areeda and Turner's analysis, however, has not survived unscathed. See O. Williamson, "Predatory Pricing: A Strategic and Welfare Analysis," 87 Yale L.Rev. 284 (1977); Scherer, "Predatory Pricing and the Sherman Act: A Comment," 89 Harv.L.Rev. 869 (1976); Scherer, "Some Last Words on Predatory Pricing," 89 Harv.L.Rev. 901 (1976).

472 F.Supp. at 796. But we need not join in the debate between Areeda and Turner and their several critics about the relative merits of marginal cost pricing in general. The charge which Ferro objects to requires a finding of a relatively stable market and below total cost sales over at least four years in an industry whose customers are large, single situs industrial plants, and selective price cuts by the company with the deepest pocket to plants for which the weakest competitor in the industry is a logical competitor. The charge permitted, but did not require, the inference of predatory intent. A factor bearing on that intent was the secrecy of the discriminatory pricing arrangements, which could be found by the jury to have been designed to protect the level of prices to plants more distant from Hommel, and thus more shielded from competition by freight differentials. If that set of circumstances would not support an inference of predatory intention under the Areeda and Turner analysis (which I do not suggest), the analysis is flawed, for those circumstances strongly suggest an intentional move on a financially weak but otherwise effective competitor for the frit trade of those large buyers located where they can be serviced by Ferro's Nashville plant. The Areeda and Turner thesis is that marginal cost pricing is presumptively rational conduct in the short run because it is either profit maximizing or loss minimizing. Thus, the argument goes, the inference of predatory intent is irrational. But in the long run a policy of sales below total cost is not profit maximizing. If Ferro's Nashville plant were to continue sales below total costs over the long term it would cease to be a profit center in Ferro's diversified business. If it could compete with the competitor which was located near enough to users of frit which the Nashville plant could supply only by selling below cost, a rational profit maximizing policy would be to close the plant, not to subsidize it permanently. Thus in the sum of circumstances which the jury could find here—a relatively stable market, two plants located

as the Nashville and Carnegie plants are, one of them owned by a diversified deep pocket company and the other a small family business—the inference of predatory intention from long term sales below total cost is not compelled but, as the court charged, certainly legitimate. The jury could well have reasoned that Ferro intended to deprive Hommel of the Briggs, Knoxville; General Electric, Louisville; and General Housewares, Terre Haute businesses by below cost pricing, knowing that freight differentials insulated its other frit plants from competition from Carnegie, in the expectation that Hommel would fail and that there were sufficient barriers to entry that it would not soon be replaced. See Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy*, 89 Yale L.J. 213, 227–31 (1979) (discussing the multiple factors which may be barriers to entry). If the recent case of *Northeastern Telephone Co. v. AT&T*, 651 F.2d 76 (2d Cir. 1981), may be read as committing the Second Circuit to the rule that pricing above marginal cost is always in all circumstances legal, I would not follow it, because such a rule would exclude from the factfinder the authority to draw a legitimate inference of predatory intention from the totality of circumstances. The Supreme Court affirmed the legitimacy of such an inference in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). Thus I would reject Ferro's claim that the charge was in error in the one respect complained of.

### III.

Ferro claims on appeal that even if the charge on predatory pricing was correct and the evidence supports the inference of predatory intention, it is entitled to a judgment notwithstanding the verdict nevertheless, because there was no proof of any adverse effect on competition. That contention was not listed among the grounds advanced in Ferro's motion for judgment notwithstanding the verdict. In the motion for a directed verdict the point was advanced, albeit

cryptically.[3]  Since the point was raised below it can be considered here, at least as a ground for a new trial, and perhaps as a ground for ordering the entry of judgment notwithstanding the verdict.[4]  Ferro's position is that because the market shares of the five firms which manufactured frit did not significantly change over the years in question, as a matter of law the jury could not find that "the effect of such discrimination may be substantially to lessen competition ... in any line of commerce, or to injure, destroy, or prevent competition with [Ferro]".  15 U.S.C. § 13(a).  Ferro's argument, however, misconceives the prophylactic purposes of the Robinson-Patman Act.  Faced with discriminatory pricing a primary line competitor is not required to wait until the cause of action for injury to its business or property vests in a trustee in bankruptcy.  Indeed it can sue for injunctive relief even before any harm to its business or property has occurred, although in such a case the recovery of damages under Section 4 of the Clayton Act would be impermissible.  The distinction between the requirements for proving a Section 2(a) violation and those for proving damages recoverable under Section 4 is an important one which was reemphasized by the Supreme Court in *Truett-Payne Co. v. Chrysler Motors Corp.*, —— U.S. ——, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).  There the Court's majority rejected the contention, relied on by Justice Powell dissenting, that because plaintiff's market share did not shrink over a four year period, he could not establish a Section 2(a) violation.  The test for a Section 2(a) violation is whether, based on the evidence, competition, overall or with the discriminator, *may* be injured.  Actual harm is relevant only to the damage

claim.  The distinction made in *Truett-Payne* is not new to Robinson-Patman jurisprudence.  *See Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 702, 87 S.Ct. 1326, 1335, 18 L.Ed.2d 406 (1967).

In evaluating the likelihood of harm to competition with Ferro, the jury could consider the relative financial strength of Ferro and Hommel, the location of the three plants which were selected for below total cost pricing, the duration of the price cuts, and the stipulated fact that Hommel maintained its 6–7% market share over the four years in issue while incurring operating losses in each year.  The jury may well have concluded that those operating losses would not have occurred if Ferro had been able to retain some of the Briggs and General Electric and obtain some of the General Housewares business.  It could have found that Hommel could not increase its share of business at the limited number of industrial plants which used frit as a raw material because by the custom of the trade, freight was equalized to the nearest producer's plant, and absorption of freight to distant customers would increase its operating losses.  It could have found that the price cuts exposed Hommel to the risk of bankruptcy, in an industry with only five suppliers.  Short of this it could have found that by freezing out Hommel from three logical customers, Ferro forced Hommel to compete with it for customers as to which one of its other plants had a freight differential advantage, which would place a floor under its competitors' prices.  In short, there was ample evidence of the possibility of harm to competition in the frit industry in general and of competition with Ferro in particular.  The possibility of such harm coupled with

3.  Ferro's attorney argued:

> On the Robinson-Patman Act, we have two bases for our motion.  One, that in a like competition case, there is the same requisite for showing damage to competition.  All, again, that has been shown is that Hommel might have gotten sales.  That is the best that was testified to.  Nobody—their market share was the same; nobody was excluded from the market.  Easy entry into the market is all established at this juncture by the evidence.

(III A, 517).

4.  But *cf. Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947); *Globe Liquor Co. v. San Roman*, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177 (1948); *Johnson v. New York, New Haven & Hartford Railroad*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952); *Garman v. Metropolitan Life Ins. Co.*, 175 F.2d 24, 28 (3d Cir. 1949).

pricing which could legitimately be inferred to be predatory, suffices to establish a violation of Section 2(a).

### IV.

Ferro's final point is that Hommel's proof of damages does not satisfy the standard of certainty required by Section 4 of the Clayton Act. It concedes that the court's charge on proving lost net profits was correct.[5] But Ferro urges that Hommel's evidence establishes that it would have incurred additional overhead expenses in order to produce the extra frit it might have sold but for the illegal pricing, and that the jury damage award fails to take such expense into account. However the jury heard the testimony of Richard O. Hommel:

Q. Would you—if you had produced an additional 2,000,000 pounds, 3,000,000 pounds a year, which you say you could have done, would you have had any additional costs, other than the materials and the items you have read to us?

A. Nothing of any major consequences.

(II A, 40). If it credited this testimony, the jury was entitled to calculate damages on lost sales without taking into account any additional overhead expense. Thus Ferro's sole challenge to the amount of the verdict is misdirected. There is ample evidence from which the jury could find lost net profits.

### V.

I would affirm the order of the district court denying Ferro's motion for judgment notwithstanding the verdict.

---

**5.** The court charged:

[I] instruct you that only lost net profits, before taxes, may constitute an item of actual damages in antitrust cases. Net profit before tax is the total revenue received from sales minus the cost of the goods sold, including labor and material costs, and minus operating expenses and overhead.

