752 F.2d 891
 1985-1 Trade Cases 66,356, 17 Fed. R. Evid. Serv. 319
 INDIAN COFFEE CORP., a Corporation, and Penn-Western Food
Corp., a Corporation
v.
The PROCTER & GAMBLE COMPANY, a Corporation, and The Folger
Coffee Company, a Corporation.
Appeal of INDIAN COFFEE CORP. and Penn-Western Food Corp.
 No. 83-5409.
 United States Court of Appeals,
Third Circuit.
 Argued May 15, 1984.
Decided Jan. 15, 1985.
Rehearing and Rehearing En Banc
Denied Feb. 15, 1985.
 
 Thomas P. Ravis (Argued), John L. Laubach, Jr., Clark, Laubach, Fulton, Ravis & Semple, Pittsburgh, Pa., for appellants.
 John W. Beatty (Argued), Mark Silbersack, Patrick D. Lane, John D. Luken, Dinsmore & Shohl, Cincinnati, Ohio, Cloyd R. Mellott, John W. Ubinger, Jr., Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellee Folger Coffee Co.
 Before GIBBONS and HUNTER, Circuit Judges and STAPLETON, District Judge.*
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 Indian Coffee Corp. ("Indian Coffee") appeals from a judgment entered after the grant of a Fed.R.Civ.P. 50(a) motion against it at the end of its case in its suit charging that Folger Coffee Company ("Folger") violated section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. 15 U.S.C. Sec. 13(a) (1982). Penn-Western Food Corp. ("Penn-Western"), a wholly-owned subsidiary of Indian Coffee, appeals from a summary judgment in favor of Folger on the same charge. 482 F.Supp. 1098 (1980). Both plaintiffs allege that Folger, in the years 1971 through 1974, sold coffee in the geographic market in which Folger competed with them at prices lower than Folger charged in other geographic markets. We affirm the summary judgment against Penn-Western. We reverse the judgment against Indian Coffee and remand for a new trial, because on this record a directed verdict was improper.
 
 I.
 
 2
 The Parties and Proceedings in the Trial Court
 
 
 3
 Indian Coffee is a coffee roaster located in Pittsburgh, Pennsylvania, which for more than fifty years has marketed locally a brand of vacuum-packed coffee called Breakfast Cheer. That brand, until 1968, was marketed only in the greater Pittsburgh area, which includes parts of eastern Ohio. In 1968, Indian Coffee, having acquired greater plant capacity, extended its marketing of Breakfast Cheer to the Cleveland, Ohio area. Neither Indian Coffee nor its subsidiary, Penn-Western, competed outside these geographic areas. In its primary marketing area around Pittsburgh, prior to 1973, it competed with Maxwell House, Hills Brothers, Chase & Sanborn, and an assortment of private label brands.[1] Breakfast Cheer's market share was, in that geographic market, second only to that of Maxwell House.
 
 
 4
 Folger, prior to 1971, was a leading seller of branded coffee west of the Mississippi. Late in that year, for the first time, Folger commenced marketing its brand of coffee in Pittsburgh. Its efforts to gain market share in the geographic area in which for the first time it competed with Breakfast Cheer led to this lawsuit.
 
 
 5
 The theory of plaintiffs' case is that when Folger entered the Pittsburgh market area it sold coffee to retailers in that area at prices significantly lower than the prices which it charged in other geographic markets. For a time plaintiffs attempted to retain their market share by meeting the price concessions made by Folger. Because the plaintiffs sold only in the Pittsburgh and Cleveland geographic areas, however, they were unable to subsidize sales below cost in their sole marketing area with the profits derived from other geographic markets and were forced out of business. In April of 1974 plaintiffs sold their coffee business. Thus, according to the plaintiffs, Folger's geographic price discrimination eliminated a theretofore vigorous primary line regional competitor.
 
 
 6
 Folger moved for summary judgment against Penn-Western on the ground that because Penn-Western had sold all its assets, including its possible claims against Folger, to Wechsler-Penn Coffee Corp. ("Wechsler"), Penn-Western lacked standing to bring this action.
 
 
 7
 Indian Coffee's claim against Folger proceeded to trial. Indian Coffee produced evidence that Folger, in the relevant markets, afforded to retailers various forms of allowances which were greater than the allowances offered in other geographic markets. In support of its claim that it was injured in its business and property, it produced the testimony of its president, James Deily, and the opinions of several experts. At the end of Indian Coffee's case the trial court struck the testimony of its experts, and directed a verdict against it. Absent the stricken testimony, the court held, there was insufficient evidence to create a jury question on the issue of harm to competition, insufficient evidence that Folger's pricing practices caused Indian Coffee injury, and insufficient evidence to support a non-speculative award of damages. This appeal followed.
 
 II.
 Summary Judgment Against Penn-Western
 
 8
 We have reviewed the pleadings, affidavits, and depositions on file, and find no error in the trial court's conclusion that the unambiguous terms of the agreement of sale of Penn-Western's assets to Wechsler transferred to Wechsler any Penn-Western claim against Folger. The language of the agreement is unequivocal. Indian Coffee expressly reserved the right to prosecute antitrust claims for damages. Penn-Western did not. The parties' intention is manifested in the writing, and construction of the writing is a question for the court. E.g., Fogel Refrigerator Co. v. Oteri, 10 D.C.2d 511, 515, 391 Pa. 188, 137 A.2d 225, 228 (1958); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1271 (3d Cir.1979).
 
 III.
 Directed Verdict Against Western Coffee
 
 9
 A Rule 50(a) directed verdict may be granted only if, as a matter of law, viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor. Our review of the grant of such a motion is plenary. Thus our task on Indian Coffee's appeal is to determine (1) what evidence should have been admitted, and (2) whether in light of all such evidence a prima facie case has been made out.
 
 A.
 
 10
 The Court Erred in Striking Expert Opinion Evidence
 
 
 11
 In ruling on the admissibility of expert opinion testimony tendered by Indian Coffee, the trial court explicitly adopted the standard announced in Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp. 1313, 1341 (E.D.Pa.1980). That standard permits the trial court to exclude opinion evidence based not upon materials on which experts in the relevant field base their opinion, but upon the court's own judgment of the reliability of those materials. The opinion upon which the trial court relied was reversed.[2] In In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 277 (3d Cir.1983), we held:
 
 
 12
 In substituting its own opinion as to what constitutes reasonable reliance for that of the experts in the relevant fields the trial court misinterpreted Rule 703. The court's approach involved fundamental legal error because, as a matter of law, the district court must make a factual inquiry and finding as to what data experts in the field find reliable. There is no discretion to forbear from making this inquiry and finding. Insofar as the district court substituted its own view of reasonable reliance for those of the experts, therefore, we review for legal error.
 
 
 13
 Nowhere did the trial court focus on the relevant inquiry as to what admittedly qualified experts in valuation of businesses relied upon. The court failed to make a finding as to what data experts in the field find reliable; instead it substituted its own judgment for that of the experts. This approach is prohibited by the governing case law interpreting Fed.R.Evid. 703. The excluded expert opinion evidence was clearly admissible. See Bauman v. Centex Corp., 611 F.2d 1115, 1120 (5th Cir.1980); Baumholser v. Amax Coal Co., 630 F.2d 550, 553 (7th Cir.1980).
 
 
 14
 Robert S. Kaplan, Dean of the business school at Carnegie-Mellon University, who qualified as an expert in the use of analytical models for valuation of businesses, made an analysis of the valuation of Indian Coffee at the end of 1972 for a reasonably knowledgable observer. He testified that an expert in such valuations would, and he did, talk to Mr. Deily, an officer and director of the company, about its operations in order to become familiar with them so as to help interpret the financial numbers he would later study. He relied on the audited financial returns of the company through 1972, and drew his own conclusions. While he relied on those audited financial returns, he used supplementary data to corroborate the reasonableness of the estimates he obtained from his detailed study. Those financial statements, plaintiffs' exhibits 292 through 300, are in evidence. He also looked at unaudited internal statements, some of which had a more detailed breakdown of product lines and revenues, to get an overall feel for the pattern of sales and experience during the year, as well as the importance of product lines. He also examined summaries prepared by Dr. George Bodnar. That information, reflected in plaintiffs' exhibit 304 in evidence, includes the percentage of coffee sales for Indian Coffee by three major categories: its brand Breakfast Cheer, its private label, and its institutional coffee sales. He was asked to evaluate the business as of December 31, 1972, and testified that the operations of the company for the years 1969 through 1972 were the most appropriate indicators to an interested buyer or lender of the company's future. He also considered the relative profitability of other coffee companies, obtaining that information from reasonable sources, including information obtained from the defendants in this lawsuit, and information obtained about other coffee companies prepared by staff accountants of the Federal Trade Commission.
 
 
 15
 The foundation for admissibility of his expert opinion testimony based on the materials he examined was clearly established. Dean Kaplan was asked:
 
 
 16
 Q. Is this a typical procedure, getting whatever information is reasonably available to use in making evaluations of the sort you were hired to make?
 
 
 17
 A. Sure, when you do this type of research, it is a little like being a detective, you kind of snoop around in a lot of data and forms, most of which is not very helpful, and occasionally you find a little nugget that you can look at very carefully, assess that it may not be the same type of information that you really wanted, but at least it is something. Whereas before you had nothing, now you have some little clues to help you.
 
 
 18
 Q. And is this the procedure which you would follow in evaluating any business, be it a coffee business or any other business where the information is not all directly publicly available?
 
 
 19
 A. You have to do whatever you can to get whatever relevant information you can find from whatever sources.
 
 
 20
 App. 623.
 
 
 21
 With respect to the information obtained from the Federal Trade Commission, Dean Kaplan was asked, and answered:
 
 
 22
 Q. And did you consider this information to be worthy of looking at in this connection?A. Yes. I did look at it, and in fact found parts of it that would be helpful in enabling me to understand the operations of the Indian Coffee Company during the 1969 to 1972 time period.
 
 
 23
 Q. Was information of the sort about Maxwell House which you received that you would normally use, given the circumstances of the availability of information in the areas in which you were exploring?
 
 
 24
 A. It is exactly the type of information one would like to have in this situation in that it provided detailed cost accounting data by product line basis. By product line basis, I mean Maxwell House Coffee did not have other brands such as instant coffee or non-coffee products, which are produced and sold by General Foods Company.
 
 
 25
 App. 625-26.
 
 
 26
 Thus Kaplan, qualified as an expert in valuation of businesses, testified unequivocally that the data he relied on in reaching the opinion about which he was to testify were "of a type reasonably relied upon by experts" in the field of valuation of businesses.
 
 
 27
 At this point in Dean Kaplan's testimony the court permitted cross-examination as to his knowledge of the details of the Federal Trade Commission hearings. That cross-examination in no way impeached Dean Kaplan's testimony that experts in valuation would rely on the materials he relied on in reaching an opinion. App. 627-52.
 
 
 28
 Walter A. Bissell, a group Vice President of Duff and Phelps, an investment banking firm in Chicago, in charge of the valuation of food companies for that firm, and with many years of experience in that field, gave his opinion as to the control value of Indian Coffee Company, which he equated to fair market value or reasonable value. He, too, testified at length about the information on which valuation experts in the investment banking business would rely. App. 792-813. Bissell examined much of the same data as did Dean Kaplan, and, like him, made inquiries of Mr. Deily, Indian Coffee Company's President, with respect to the kinds of sales volumes that company could maintain with lower promotional allowances. App. 813. His testimony, that he obtained and relied on that information, was properly admitted over objection. Bissell obtained from Mr. Deily marketing information not only about what sales levels could be expected at various levels of promotional allowances, but even about the impact of a blend of coffee appealing to the tastes of people in the marketing area. App. 817. It is quite clear from Bissell's overall testimony that obtaining marketing information from such sources was a normal feature of an investment banker's evaluation process. In asking Deily about marketing, Bissell was relying on information of a type normally relied on by investment banking experts in valuation. Moreover Deily's testimony as to the market share he could obtain at a level for promotional allowances was already in evidence at the time Bissell testified. Exhibits 346 through 352 prepared by Bissell and reflecting the factors he took into account in expressing his opinions were admitted in evidence. App. 837. Critical was Bissell's opinion that the company's 1970-71 sales volume could have been maintained with a 16 percent expenditure for promotional allowances without any significant loss in sales. When cross-examined, Bissell was asked and answered:
 
 
 29
 Q. But you are not giving any professional opinion here today, are you, sir, yourself as to whether or not that underlying assumption is in fact correct or whether that condition would be achievable?
 
 
 30
 A. Well, let me put it this way. I think we went through this at the deposition. That was Mr. Deily's opinion, and it served as one of our framework assumptions. It was also in my opinion verified by the Folger and Maxwell House data. I will agree that that is a marketing opinion, but in my opinion the assumption is a reasonable one and I wouldn't incorporate it into my analysis if I didn't so consider it reasonable.
 
 
 31
 When asked if he was giving a marketing opinion he made his position perfectly clear, answering:
 
 
 32
 A. Well, I don't want to get into a semantics problem here. I have utilized that assumption in my analysis, and I think I have made clear where I got that assumption. It is my opinion it is reasonable, and I am opining as to value.
 
 
 33
 App. 840-41. Thus Bissell's cross-examination reinforced his prior testimony that investment bankers making a valuation would rely upon marketing information obtained in the manner and from the sources he obtained the information used in arriving at his opinion. His cross-examination precisely and unequivocally satisfied the requirements of Fed.R.Evid. 703.
 
 
 34
 Clement H. Darby, a Vice President in the corporate finance group of Girard Bank of Philadelphia, which acts as an investment banker, also testified, as an expert on valuation, as to the fair market value of Indian Coffee Company. He, too, testified at length as to what materials experts in valuation rely upon. App. 987 et seq. His method of valuation was to determine the start up costs of a comparable company, using data gathered not only from Indian Coffee Company but from other sources. Arriving at that figure, he expressed the opinion that this amount would be paid for Indian Coffee Company's operating assets by a willing buyer interested in entering the coffee business. His analysis, too, made marketing assumptions; when asked about them he was asked and answered:
 
 
 35
 Q. Those are basically Mr. Deily's opinions that you have been asked to accept at face value, is that correct?
 
 
 36
 A. That is correct, plus my review of an older report prepared by Dean Kaplan which had information in that which was germane to what you are saying.
 
 
 37
 App. 999. Thus Darby's testimony is consistent with that of the other experts on valuation. Experts on valuation rely, in forming their opinion on the value of a company, on marketing information obtained from the company and from companies they deem comparable.
 
 
 38
 The record contains no testimony that experts in valuation of companies would not rely on information such as that on which Dean Kaplan, Mr. Bissell and Mr. Darby relied in forming their opinions. Nevertheless the trial court struck all the expert testimony on damages. App. 1255-74. In so ruling it made precisely the same error of law that the district court made in Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp. 1313, 1341 (E.D.Pa.1980). A court may not substitute its judgment for that of experts in the field of valuation as to what marketing data an expert should rely upon in reaching an opinion, for in doing so it invades the province of the jury. The credibility of the experts' opinions on valuation was on this record unquestionably appropriate for resolution by the trier of fact. Indeed there is no evidence casting any doubt on the testimony of the valuation experts that experts rely on the information they relied upon.
 
 
 39
 The stipulations and Indian Coffee's evidence permit a finding that during the years 1969 through 1972 Indian Coffee Company had achieved a significant market share for its brand, Breakfast Cheer, of about 18% of the market for branded coffee in the Pittsburgh area, its primary marketing area, and a significant but lower market share in the Cleveland area, its secondary marketing area. The evidence would also permit a finding that this share was achieved because of two factors: consumer preference in the Pittsburgh area for a strong coffee flavor, and promotional allowances to grocery chains which, as a percentage of sales was higher than the industry average. The jury could find that during the period in which it was using high promotional allowances to achieve market share for Breakfast Cheer, Indian Coffee Company was nevertheless profitable. Plaintiffs' Exhibits 292-300. Indeed that profitability is undisputed, for the financial statements reflecting it were admitted by stipulation. App. 110. There is no evidence from which it could be inferred that, absent the complained of activities of Folger Coffee Company, Indian Coffee Company could not at least have maintained its market share with the same level of promotional allowances as theretofore.
 
 
 40
 Indian Coffee's evidence also would permit a finding that in marketing branded food products through grocery chains manufacturers resorted to high promotional allowances in order to achieve increased market share and consumer brand acceptance. The evidence would also permit a finding that once brand acceptance is obtained, a manufacturer will normally reduce its promotional allowances to levels closer to the industry average, so as to increase profitability.
 
 
 41
 James R. Deily, one of Indian Coffee's witnesses, has had many years of experience in selling food products. At the time of his testimony he was President of Fort Pitt Brand Meat Company. He was the sales manager of Oswald & Hess Company, a meat company, when Latrobe Brewery, which had just purchased Indian Coffee, hired him as sales manager for that firm. Eventually he became general manager of Indian Coffee. He was hired for the specific purpose of increasing sales of Breakfast Cheer Coffee, App. 116, and was successful in doing so. App. 118. Deily's experience in coffee marketing was not confined to Indian Coffee. In 1965 he was hired by Eppens Smith Company, a coffee roaster in Secaucus, New Jersey, owned by Ward Foods, which had both a branded label coffee business in the New York metropolitan area and a private label business. His responsibilities as Chief Executive Officer of that company included marketing. App. 120. From his testimony it could be found that the marketing problems facing Eppens Smith Company were quite similar to those of Indian Coffee. When Deily purchased Indian Coffee in 1966, and once again undertook its management, he found that Breakfast Cheer sales had slipped. App. 123-24.
 
 
 42
 Deily testified that Breakfast Cheer Coffee was blended specifically to satisfy the taste of consumers in the Pittsburgh market. App. 127. The valuation experts found this marketing information to be significant.
 
 
 43
 Deily's intention when he purchased the company was to build its sales, and to diversify into other food lines. He testified in detail about the manner in which he achieved the market share which produced the 1969-1971 results. App. 128 et seq. By the end of 1971 his efforts at achieving market share in Indian Coffee's primary market area produced the result that its product was found in 93% of the grocery stores in that area; second in this respect only to Campbell Soups. App. 137. Deily testified in detail about the importance of "facings" of branded products on supermarket shelves and the fact that such "facings" reflect consumer acceptance in the market. App. 138. He also testified about the marketing significance of supermarket "featuring" of branded staples as a reflection of consumer acceptance and about the fact that, by 1971, Breakfast Cheer was being featured in supermarkets in its primary market area as frequently as, or more frequently than, Maxwell House Coffee, the brand with the largest market share.
 
 Deily explained his marketing strategy:
 
 44
 It was a small profit, but that was directed in that area because of some of the things I wanted to do with employees, I wanted to promote our coffee heavy with promotional activities, I wanted to do a better job with media advertising. I felt rather than have a large bottom line I would much rather plow my money back in the business for growth, and I knew by doing this I could eventually obtain somewhere in the vicinity of 20 percent share of the market.
 
 
 45
 App. 140. Deily's marketing strategy was obviously successful; by the end of 1971 Breakfast Cheer had facings in 93% of the grocery outlets in the area, and was only about 2% short of his goal of a 20% market share.[3]
 
 
 46
 Deily's expertise in coffee marketing was recognized by the court; he was permitted, over objection, and correctly so, to express opinions on marketing. E.g., App. 148. He testified at length on how vacuum packed coffee was distributed and marketed, including the various promotional devices employed. E.g., App. 154.
 
 
 47
 Deily testified that for the coffee trade generally, with which he was thoroughly familiar after eleven years as Chief Executive officer of two separate coffee companies, the normal level of promotional allowances is approximately 14 percent of sales price. App. 160. The levels of promotional allowances made by Breakfast Cheer during the period it was seeking to increase its market share were stipulated. From the fact that the industry generally operated at the promotional allowance level of 14% of sales price, a factfinder could reasonably infer that industry experience was such that this was a level at which the existing market share would be maintained in conditions of lawful competition. Thus even aside from Deily's expertise in food marketing there is evidence from which a factfinder could infer that when Deily's goal of a 20% market share was achieved, Indian Coffee would be able to maintain it in conditions of lawful competition with promotional allowances at or near the industry average. The stipulated financial statements establish that Deily was close to achieving his desired market share.
 
 
 48
 But there is more. First, there is Deily's own expert opinion, after years of experience in the business of selling to grocery chains, that once his market share was achieved he could maintain it by promotional levels at or near the industry level. That opinion is not based on speculation, but upon hard practical experience in the coffee industry in which Deily worked, with marketing responsibilities, successfully for years.
 
 
 49
 Having properly permitted Deily to express his expert opinion on marketing matters, the court later changed position, striking his testimony. Before making that ruling the court invited argument on "[E]xperts relying on improper assumptions." App. 1263. It is quite clear, therefore, that in striking Deily's testimony the court was proceeding in the same misplaced reliance on Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp. 1313, 1341 (E.D.Pa.1980), as when it struck the testimony of Dean Kaplan, Mr. Bissell and Mr. Darby. After hearing argument the court observed:
 
 
 50
 Now, Mr. Deily you say was qualified to testify as he did, but he was not offered as an expert. There was no expert report, so his testimony on that has to be the person of a lay person, and under Rule 703, in order to justify the opinion of a lay person, I should say, one must, that the opinion must include the factors upon which it was based, and what did you have here, in general statements such as he was in the business all these years and he worked for the coffee company in New York and so on. That was the basis of his opinion. No details at all. No detailed facts at all. Simply, I am offering my opinion because I have been working in this business since 1960, and I question whether that is sufficient.
 
 
 51
 Certainly all the cases cited by the defendant I think stand for the proposition that the unsupported estimates offered as a basis for experts are not sufficient because it is unreasonable for an expert to rely on that kind of evidence or background.
 
 
 52
 App. 1265.
 
 
 53
 These observations seriously misstate the record in several respects. First, Deily's testimony was offered and admitted as expert testimony about coffee marketing. Second, his testimony was not merely that he was in business all these years and that he worked for the coffee company in New York. He testified in abundant detail from personal experience about how manufacturers of grocery products obtained facings on supermarket shelves, how they went about increasing market share, how various forms of promotional allowances worked in the supermarket marketplace, the significance of coffee flavor to consumer acceptance, the success of his effort to increase market share, and the level of promotional allowances which the coffee industry in general used to maintain market share. Clearly his expression of the opinion--that when he achieved an increase of market share to 20% he could maintain it with promotional allowances typical in the industry--was rationally based on his own perception over eleven years in coffee marketing, and was helpful to a clear understanding of his testimony or the determination of a fact in issue. Thus even treating Deily solely as a lay witness, his testimony amply satisfies the standards of Fed.R.Evid. 701. See Teen-Ed, Inc. v. Kimball Intern., Inc., 620 F.2d 399 (3d Cir.1980). Moreover the court apparently was not consciously aware of the standards of Rule 701. Rather, the first and last quoted sentences of its ruling disclose that the court was applying the Zenith Radio Corp. misinterpretation of Rule 703. Having misapplied Rule 703 in striking Deily's testimony, the court then struck the testimony of Dean Kaplan, Mr. Bissell and Mr. Darby because they relied on marketing information supplied by Deily, in or out of court, App. 1272, even though their uncontradicted testimony was that experts such as they, in evaluating companies, relied on projections such as he made. That error was compounded, because those experts did not rely on that source of information alone, but on information such as that obtained from the Federal Trade Commission and the defendants as to what level of promotional allowances was typical in the industry, and testified that experts in valuation would rely on such information. In making the ruling the court stated expressly that "it is unreasonable for an expert to rely on this testimony under Rule 702, 3, Rule 403." App. 1272. What we have said about the court's error in striking the testimony of Dean Kaplan, Mr. Bissell and Mr. Darby applies equally to the testimony of Dr. Bodner, who testified as to prospective lost profits as an alternative measure of damages.
 
 
 54
 Had the opinion evidence been admitted the jury could have found that Indian Coffee's coffee business had a fair market value in late 1971 in the range of $4.2 million and that as a result of Folger Coffee Company's extremely high promotional allowances when Folger entered the Pittsburgh market, its market share, and thus its coffee business, was destroyed. It bears emphasizing that the trial court did not rely on any defect in the proofs with respect to the effect of Folger's marketing activities on Indian Coffee's business. Thus, if as is demonstrated above, the trial court committed legal error in striking the expert opinion evidence on valuation, a new trial is required.[4]B.
 
 
 55
 Other Grounds Relied on are Legally Insufficient
 
 
 56
 Besides the absence of proof of injury, the trial court articulated alternative bases for a directed verdict. These were that the plaintiffs failed to produce any evidence of harm to competition, as required by O. Hommel Co. v. Ferro Corp., 659 F.2d 340 (3d Cir.1981), cert. denied, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982), and that they failed to produce any evidence that the injury suffered by Indian Coffee was causally related to Folger Coffee Company's alleged violation of the antitrust laws. App. 93-94. Since either might be a ground for affirmance despite the errors discussed above, we address them briefly.
 
 
 57
 The antitrust violation alleged is a violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. Sec. 13(a).[5] Indian Coffee and Folger Coffee Company are primary line competitors. Such competitors injured by geographic price discrimination may recover damages. Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); F.T.C. v. Anheuser-Busch, Inc., 363 U.S. 536, 542-43, 80 S.Ct. 1267, 1270-71, 4 L.Ed.2d 1385 (1960).
 
 
 58
 In a preliminary ruling on a motion for partial summary judgment the district court, considering what sorts of discrimination in promotional allowances would be considered as "price" discriminations, adopted an extremely narrow definition of price, by excluding from the calculation of price promotional allowances in the form of coupons which could be used by retail customers to obtain price cuts, and by the redeeming retailers as credits against invoices. The court reasoned:
 
 
 59
 In this case, while competitive injury may have resulted from Folger's consumer coupon campaign, the geographical price reductions offered by Folger were not to its purchasers or customers--the retail grocery outlets--as proscribed by Sec. 2(a), but directly to the ultimate consumer, the "buying public," which concededly ... is not Folger's "purchaser" under Sec. 2(a), and, conduct therefore, not proscribed by Sec. 2(a).
 
 
 60
 App. at 88-89. The court's approach to geographic price discrimination in the form of credits against invoices for price reductions given to retail customers in the favored market is entirely too narrow. See Viviano Macaroni Co. v. F.T.C., 411 F.2d 255 (3d Cir.1969). A price discrimination granted to a retailer on condition that he pass it on to a consumer so as to increase the discriminator's share of the geographic market is nevertheless a price discrimination. The effect on a primary line competitor of a discrimination in such a form is identical. Indeed it was the purpose of Congress in passing section 2(d) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. Sec. 13(d), to prevent facile avoidance of the prohibition against price discrimination by framing what is economically such a discrimination in another form.[6] Thus from the beginning of the case the trial court took an unduly restrictive view of the elements of a Robinson-Patman Act violation.
 
 
 61
 Even with the adoption of an unduly restrictive definition of price discrimination, however, the court admitted plaintiffs' exhibits 604-622 from which a jury could, and probably must, find that in relevant time periods Folger discriminated in price between the Cleveland and Pittsburgh markets, and other geographic areas in which, unlike Cleveland and Pittsburgh, they already had a large share of the market. Thus although the court erred in its preliminary ruling on the elements of the price to retailers, geographic price discrimination still was established. The court therefore did not predicate the directed verdict upon the absence of such discrimination, or upon the absence of predatory intent in making the discrimination. Had a proper price definition been applied, the much greater discriminations reflected in exhibits 13, 273 and 533, marked for identification, but not admitted in evidence, would have been established.
 
 
 62
 Conceding that geographic price discrimination had occurred, the court held that there was no evidence from which a jury could find harm to competition, even though the discrimination could be found to have resulted in the demise of a strong regional competitor. In reaching this conclusion the court relied on this court's opinion in O. Hommel Co. v. Ferro Corp., 659 F.2d 340 (3d Cir.1981). That reliance was misplaced. In Hommel the majority refused to characterize the case as one of geographic price discrimination. 659 F.2d at 351. Here the discrimination can be classified in no other way. The relevant market was stipulated. In Hommel the plaintiff primary line competitor, during the period when the price discriminations operated, increased revenue from sales, and decreased net losses. 659 F.2d at 342. Moreover, its share of the national market for its product remained stable, as did that of the price discriminator. Here it could be found from the evidence that in the stipulated relevant market a strong regional competitor lost its 18% market share and went out of business. Even assuming the court's erroneous exclusion of certain promotional allowances for the purpose of measuring discrimination, the cost of those allowances had to be taken into account for the purpose of determining cost. When they are, it is plain that in the targeted geographic markets Folger's sales prices were below green coffee cost, App. 1409-16, below material cost, App. 1411-20, below material and manufacturing costs, App. 1412-13, 1421-23, below total cost, App. 1414-15, 1424-26, and below marginal cost or average variable cost, App. 1192-93, 1401. Their sales prices were, in other words, below any cost relevant for the determination of predatory pricing on any theory. See Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 92 (3d Cir.1982). Thus Indian Coffee produced evidence from which the jury could, under the standard of proof announced in Hommel, infer predatory intent. 659 F.2d at 348-49. Faced with evidence from which the jury could find the elimination in a stipulated relevant market of a regional competitor holding an 18% market share--actual competitive injury--and evidence of sales below cost from which predatory intent could be inferred, the court erred as a matter of law in directing a verdict because of absence of proof of injury to competition. There is evidence sufficient for either of the methods of establishing such injury discussed in Hommel.
 
 
 63
 The court's third ground for granting the directed verdict is the alleged failure to produce any evidence that the injury suffered by Indian Coffee was causally related to Folger Coffee Company's alleged violation of the Robinson-Patman Act. As to this ground we are left entirely in the dark on the court's reasoning. The court's citation of Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), does not enlighten. If Folger did violate the Act by geographic price discrimination, Indian Coffee, a primary line competitor, was plainly within the zone of protection of that Act. Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); F.T.C. v. Anheuser-Busch, Inc., 363 U.S. 536, 542-43, 80 S.Ct. 1267, 1270-71, 4 L.Ed.2d 1385 (1960). Thus the only remaining inquiry is one of proximate cause of injury to business or property. The plaintiffs' burden of proving fact of damage under section 4 of the Clayton Act is satisfied if the illegality is shown to be a material cause of the injury. A plaintiff need not exhaust all other possible causes of the injury to satisfy that burden. Danny Kresky Enterprises Corp. v. Magid, 716 F.2d 206, 211 (3d Cir.1983). That test was amply satisfied in this record, and thus the court committed legal error in granting a directed verdict on the ground that there had been no proof of injury from the Folger Coffee Company's violation of the Robinson-Patman Act.
 
 C.
 Conclusion
 
 64
 Since the court committed legal error with respect to all three grounds on which it relied in directing a verdict against Indian Coffee, we will reverse and remand for a new trial on Indian Coffee's claim. The summary judgment against Penn-Western will be affirmed.
 
 
 
 *
 Hon. Walter K. Stapleton, United States District Judge for the District of Delaware, sitting by designation
 
 
 [1]
 Private label brands are brands packaged for retailers by coffee roasters in packages labelled with the retailer's brand designations
 
 
 [2]
 The opinion which reversed the Zenith Radio Corp. standard, In re Japanese Electronic Products, 723 F.2d 238 (3d Cir.1983), had not been filed at the time the trial court struck Indian Coffee's expert testimony
 
 
 [3]
 It should be noted that Deily's strategy of increasing market share in the Pittsburgh area by high promotional allowances is the same strategy of which he complains about Folger Coffee Company. The difference, however, is that in the case of Indian Coffee there was no geographic discrimination in pricing because Indian Coffee sold in a single market. Thus it could not subsidize its high promotional allowances in Pittsburgh with profits derived elsewhere
 
 
 [4]
 Even without the expert opinions on value, there are in evidence financial statements showing that Indian Coffee was operating at a profit from 1969 through 1971. From that evidence alone the attorneys for the plaintiffs could have argued to the jury, had they been permitted to do so, that it could determine value by capitalizing those stipulated earnings. Although the amount of damages testified to by the experts was higher, based on the reasonable assumption that in conditions of lawful competition a 20% market share could be maintained by promotional expenditures typical in the industry, no witness anywhere suggested that absent such a result the business had no value, and the evidence that Folger's pricing and promotional allowances caused that value to be lost is abundant
 There is also evidence in the record, consisting of the worksheets prepared by Dr. Bodner, which were not stricken, from which the jury could have determined an amount of future lost profits. While the trial court struck Dr. Bodner's testimony for the same erroneous reason that he struck the testimony of the remaining experts, the worksheets in evidence would permit the jury to calculate lost profits based not on the hypothesis that promotional allowances would be reduced to 14%, but on the hypothesis that they would have remained at the 1969-1971 range.
 Judge Stapleton does not join in the views expressed in this footnote.
 
 
 [5]
 Robinson-Patman Act, 15 U.S.C. Sec. 13(a):
 (a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: Provided, however, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: And provided further, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.
 
 
 [6]
 Robinson-Patman Act, 15 U.S.C. Sec. 13(d):
 (d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.