**Donna MESSINA and Linda Gundersen**

v.

**Cornelius BONNER and Dorothy Margaret Bonner.**

No. 92–0008.

United States District Court, E.D. Pennsylvania.

Feb. 16, 1993.

As Amended Feb. 17, 1993.

Nancy Larkin Taylor, Doylestown, PA, for plaintiffs.

Samuel C. Stretton, West Chester, PA, for defendants.

## MEMORANDUM

DALZELL, District Judge.

Defendants in this case, the stepfather and natural mother of two sisters who have sued them for alleged sexual abuse that concluded eighteen years ago, moved under Fed.R.Civ.P. 50(a) for judgment as a mat-

---

ter of law after the close of the plaintiffs' case on February 10, 1993. We granted that motion after rendering an oral opinion from the bench that day, and this Memorandum will amplify the reasons we stated in open court for our decision.

## BACKGROUND

As noted, the plaintiffs in this case are sisters who on January 2, 1992 filed their diversity action in this court for alleged sexual abuse that concluded in 1975. Their complaint's four counts assert claims for assault and battery, "psychological assault and intentional infliction of emotional distress", negligence and negligent infliction of emotional distress. The complaint demanded "in excess of" $2 million from the Bonners, who are retired and live on Social Security in Florida.

Summarizing three days' testimony in the light most favorable to them, Donna Messina was born in 1959 as Donna Gundersen, and Linda Gundersen, her sister, was born in 1962. Their parents were Dorothy and David Gundersen. David Gundersen died in 1968, and his widow remarried her brother-in-law, the girls' uncle, Jack Bonner, in 1969.

The combined Gundersen and Bonner families lived in a large home in Hatboro, Pennsylvania. According to both sisters, almost immediately after their mother's remarriage, Jack Bonner commenced his sexual abuse, first allegedly with Linda while still at the former Gundersen home on Rising Sun Avenue in Philadelphia, and soon after with Donna at the house in Hatboro. According to plaintiffs' testimony, the abuse continued until it stopped in 1975 when Donna finally said "No!" to Jack Bonner and complained to her mother.

In 1983, Donna Gundersen married Daniel Messina. The two remain married, and have one child. Linda Gundersen has never married. Both sisters graduated from Hatboro–Horsham High School, and Linda Gundersen has since continued her study of English literature. Both have worked most of the time since leaving high school.

Mrs. Messina and Ms. Gundersen each testified that they have always remembered the incestuous acts by Jack Bonner. Linda Gundersen, for example, admitted at trial that she "always knew that she was molested."

At the close of plaintiffs' case, after three days of a jury trial, defendants moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a).

## LEGAL ANALYSIS

Rule 50(a) authorizes the Court to "grant a motion for judgment as a matter of law" when "there is no legally sufficient evidentiary basis for a reasonable jury to have found" for a party who "has been fully heard with respect to an issue." We must view "all the evidence which has been tendered ... in the light most favorable to the party opposing the motion", and conclude that "no [reasonable] jury could decide" in plaintiffs' favor. *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 894 (3d Cir.1985), *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985). While it is true that our procedural task is in all material respects similar to the enterprise triggered by a summary judgment motion, we have the benefit of what is an unquestionably fuller record than we would have had on such a pretrial dispositive motion. *See* Charles A. Wright and Arthur R. Miller, 9 *Federal Practice and Procedure* § 2532 (1971 Ed.), citing, with approval, Eighth Circuit authority for a modest, though meaningful, distinction between the procedural postures.

The essence of defendants' Rule 50 motion is that all of plaintiffs' claims are barred by the two year limitation period specified in 42 Pa.Cons.Stat.Ann. § 5524.[1] Defendants argue that, since plaintiffs acknowledge that they always remembered the acts of which they now complain, the bar of the statute would occur by 1977 or early 1978.[2] Unsurprisingly, plaintiffs con-

---

1. All the parties agree that Pennsylvania law governs.

2. Defendants also argue that plaintiffs do not have the benefit of the infancy tolling provision

of 42 Pa.Con.Stat.Ann. § 5533, because the alleged misconduct occurred before that provision was adopted in 1984. In any event, Donna Messina attained majority on January 28, 1977,

tend that their action is not barred because of the operation of the discovery rule. In Pennsylvania, the discovery rule is "an equitable provision created to protect plaintiffs who are unaware either that they have been injured or of who caused their injury." *Redenz v. Rosenberg,* 360 Pa.Super. 430, 434, 520 A.2d 883, 885, *appeal denied,* 516 Pa. 635, 533 A.2d 93 (1987). Thus, the rule tolls the running of the statute until "the plaintiff knows or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Id.* As applied here, plaintiffs' contend that the statute should be tolled until they made the full "connection" between defendants' alleged sex abuse and the depression, feelings of worthlessness, and suicidal thoughts they have suffered throughout their adult lives.

We have benefited greatly in our analysis of this statute of limitations question from the thorough canvass of authority by our colleague, Judge VanArtsdalen, in *Baily v. Lewis,* 763 F.Supp. 802 (E.D.Pa.1991), *aff'd,* 950 F.2d 721, 722 (3d Cir.1991). In his review of authority from around the United States, Judge VanArtsdalen, citing Judge Plunkett's analysis in *Johnson v. Johnson,* 701 F.Supp. 1363 (N.D.Ill.1988), classifies into two patterns actions that allege sexual abuse while the plaintiff was a minor:

> (1) cases in which the plaintiff claims to have known about the sexual abuse at or before his or her majority, but did not realize that other physical and psychological problems were caused by the molestation (type 1 cases); and (2) cases in which the plaintiff alleges that he or she repressed the memory until shortly before he or she filed suit (type 2 cases).

*Baily,* 763 F.Supp. at 805 (citing *Johnson,* 701 F.Supp. at 1367).

Both parties here agree that the Gundersen sisters present a type 1 case. In *Baily,* Judge VanArtsdalen predicted that the Pennsylvania Supreme Court would, even

in a type 2 case, decline to apply a discovery rule. Although the Pennsylvania Supreme Court has not ruled on this question, we agree with Judge VanArtsdalen's conclusion which was approved, albeit by judgment order, by the Court of Appeals.

As Judge VanArtsdalen noted, the Pennsylvania Judicial Code provides that (with not pertinent exceptions) "insanity or imprisonment does not extend the time limited by this subchapter for the commencement of a matter." 42 Pa.Cons.Stat.Ann. § 5533(a). Additionally, "courts applying Pennsylvania law have consistently stated that the statute of limitations runs against persons under a disability, including one who is mentally incompetent." *Id.* 763 F.Supp. at 808 (citations omitted).

In 1988, the Pennsylvania Superior Court came to the same conclusion in *Bowser v. Guttendorf,* 373 Pa.Super. 402, 541 A.2d 377 (1988), a case where plaintiff sued her former foster parents for assault, battery and intentional or negligent infliction of emotional distress stemming from sexual molestation that allegedly occurred while she lived in the foster home. The plaintiff in *Bowser* argued, as plaintiffs do here, that the limitations period should be tolled because she was under a disability that prevented her from bringing suit. The Superior Court rejected the argument, holding that "such an allegation is not sufficient to toll the running of the statute of limitations." *Id.* at 406, 541 A.2d at 379–380. The Superior Court went on to state that the plaintiff had "not set forth allegations to demonstrate what facts rendered it unreasonable to expect her to discover her injury when it occurred." *Id.* at 408, 541 A.2d at 380.

Judge VanArtsdalen in *Baily* also predicted that Pennsylvania would apply "an objective standard of reasonable diligence." 763 F.Supp. at 809. As Judge VanArtsdalen noted, this conclusion is suggested by the Pennsylvania Supreme Court's consistent stress on the importance of statutes of limitations:

and Linda Gundersen, on April 6, 1980. Thus, even if plaintiffs had the benefit of a retroactive application of the 1984 tolling provision, their

claims would have expired, at the latest in defendants' view, by January 29, 1979 for Mrs. Messina and April 7, 1982 for Ms. Gundersen.

The defense of the statute of limitations is not a technical defense but substantial and meritorious.... Such statutes are not only statutes of repose, but they supply the place of evidence lost or impaired by lapse of time, by raising a presumption which renders proof unnecessary.... "Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs."

*Schmucker v. Naugle*, 426 Pa. 203, 205–206, 231 A.2d 121, 123 (1967) (quoting *United States v. Oregon Lumber Co.*, 260 U.S. 290, 299–300, 43 S.Ct. 100, 103, 67 L.Ed. 261 (1922)).

Given the undisputed fact that the instant case is of a type 1 variety while *Baily* was of type 2, we are necessarily presented with a case that is *a fortiori* to that Judge VanArtsdalen decided in *Baily*. Defendants' Rule 50 motion could therefore be granted entirely on *Baily*'s authority.

As an alternative holding, however, we will consider plaintiffs' "make the connection" argument. We are aware that our colleague, Judge Fullam, was congenial to an argument like plaintiffs' in his decision in *Hewczuk v. Sambor*, 803 F.Supp. 1063 (E.D.Pa.1992), although it should be stressed that *Hewczuk* was a type 2 case.

As a general proposition, we believe that the Pennsylvania Supreme Court would find little to commend such an expansive, subjective discovery rule. In cases like this, the plaintiffs are necessarily a genera-

tion younger than the defendants. If such an open-ended discovery rule were applied, suits could be maintained against defendants who would be not only much older, and more infirm, than plaintiffs, but also are more likely to be dead.[3] In a case like this, where over two decades have passed since the alleged misconduct began, it is easy to imagine how witnesses could be deceased or become unavailable, memories could fade to black, or tangible evidence simply disappear.[4] Stated more positively, precisely because cases like this present such serious issues, the fact finder should have the freshest and most reliable evidence from the maximum number of possible witnesses.

In the last analysis, however, plaintiffs' proffered theory proves too much. In arguing that the statute should not start running until plaintiffs make the full "connection" between the defendants' wrongdoing and all aspects of the plaintiffs' mental suffering, plaintiffs ask us to embark upon a voyage which even the founder of modern psychotherapy believed could well have no certain final destination. As Freud noted at the end of his career in his extended essay, "Analysis Terminable and Interminable,"[5] the "end" for which therapists hope, and to which plaintiffs urge us to embrace, is "the supposition ... that all the patient's repressions have been lifted and every gap in his memory filled." *Id.* at 320. While not excluding the possibility that such an "ambitious" end may be possible, *id.*, examples of patients from the early days of Freud's own practice support skepticism that the therapy could ever be

---

**3.** In Pennsylvania, claims may be asserted against an estate for one year after the decedent's death. 20 Pa.Cons.Stat.Ann. § 3385.

**4.** Here the evidence against defendants comes entirely from plaintiffs' memories of events eighteen to twenty-four years earlier. It is worth noting that the only physical or documentary evidence at all contemporaneous with the period two decades ago—notes, cards, and letters plaintiffs wrote to defendants in the late 1970's, and early 1980's—do not in any way suggest that anything was amiss between the parties. Plaintiffs explain that these documents are evidence of their "denial" in the therapeutic meaning of the word.

**5.** Sigmund Freud, V *Collected Papers* 316 (Strachey Ed.1956). It is pertinent to our present enterprise to take a philological digression. The actual title Freud gave this famous paper was *"Die endliche und die unendliche Analyse"*. While we have used the traditional translation by Joan Riviere that Strachey included in the *Collected Papers* and *Standard Edition*, in truth *unendlich* is better translated as "endless, never-ending", II *Langenscheidt's Encyclopaedic Dictionary of the English and German Languages* 1609 (Springer Ed.1974).

"ended".[6] Thus, though Freud bore some optimism on the point, his essay concluded with the statement that "[w]hether and when we have succeeded ... in an analysis is hard to determine." *Id.* at 357.

Is there any reason to suppose that courts are better equipped to determine these questions than Sigmund Freud? If discovery depends upon therapy—which Freud noted was in all cases "a lengthy business", *id.* at 316—then statutes of limitations, too, will be "never-ending". Indeed, when asked at oral argument whether, on plaintiffs' theory, the statute of limitations has yet started to run for these plaintiffs, their counsel candidly acknowledged that it perhaps had not because, as her expert witness testified, both sisters probably require therapy for the rest of their lives.

Putting aside the general untenability of plaintiffs' discovery rule theory, application of it here, in a totally subjective[7] way, reveals that the sisters had sufficient consciousness of the "connection" prior to January 2, 1990. In this regard, we received into evidence the notes of Donna Messina's and Linda Gundersen's therapists, which were stipulated to be authentic and accurate records of what in fact took place in the many sessions plaintiffs attended.

(a) *Donna Messina*

Donna Messina testified that in the fall of 1989 she telephoned a sex abuse hotline in order to volunteer her services. Upon disclosing her personal experiences with incest, Mrs. Messina reported that the anonymous voice suggested that Mrs. Messina should obtain therapy herself. Whereupon, Mrs. Messina commenced eighteen months of therapy with Dr. Bonnie Masland, a psychologist who is said to specialize in cases of incest and sexual abuse. All of Dr. Masland's therapy notes were, pursuant to stipulation, received as Exhibit F. These notes reveal that nine sessions oc-

curred before January 2, 1990, *i.e.*, more than two years before the filing of the instant suit.

The first session took place on October 17, 1989, and the notes of subsequent sessions reveal beyond any question that Donna Messina not only recalled the incest of which she now complains, but "connected" it with defendant Jack Bonner.

October 26, 1989: "Donna was able to express her anger ... anger especially at her family."

November 16, 1989: "Donna continues ... to bring up painful information in regard to the incest with 'Jack'." Interestingly, Dr. Masland reports in this session that "Donna would like me to run a group for incest victims."

November 30, 1989: "Getting into substantial catharsis."

December 13, 1989: Notes that the patient reports that Dorothy Bonner blames Donna for "the incest that occurred".

December 28, 1989: "Donna continues to work at expression [*sic*] the incest that occurred ... with Jack".

In her testimony, Donna Messina confirmed the stipulation of her counsel that Dr. Masland's notes accurately summarize what Mrs. Messina said in her therapy sessions. The quoted language leaves no doubt that, even by the most liberal subjective standards, Donna Messina in 1989 was aware of her incest, knew that Jack Bonner was the cause of it, and that it all made her very angry and hurt.

Short of receiving a certificate from Dr. Masland that Mrs. Messina had "connected" *all* of the psychological effects of the alleged incest with Jack Bonner, it is hard to imagine a stronger record of actual knowledge sufficient to trigger the statute. As our Court of Appeals noted in *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir.1990), " 'plaintiffs need not know that they have a cause of action or that the

---

**6.** Freud describes at 323–324 the example of the ultimate failure of what would have been one of his most successful treatments, the celebrated woman whose hysteria made her unable "to walk, owing to acute pain in her legs."

**7.** "Subjective" here means within the mind of the particular plaintiff, as opposed to what was the objective reality. We recognize that these realities are not necessarily mutually exclusive.

injury was caused by another party's wrongful conduct', for 'once [a plaintiff] possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim'" (emphasis in original) (quoting *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268, 1275 (3d Cir.1987)). On this record, therefore, Donna Messina clearly had enough knowledge of the torts that are the subject of this lawsuit.[8]

### (b) *Linda Gundersen*

Linda Gundersen began psychotherapy much earlier than her older sister. As early as 1986, for example, she told her psychotherapist that she had a sexual relationship with her stepfather. In the spring of 1989, Ms. Gundersen began intensive therapy with Cipora Katz, a therapist, and Dr. Rosenwald, a psychiatrist. The notes of these mental health professionals, and others, were admitted pursuant to stipulation as Exhibit G. Once again, the notes of these therapists, stipulated to be accurate and ratified on the witness stand, leave no doubt that Linda Gundersen fully apprehended "the salient facts" that triggered, even under her theory of the discovery rule, the two year statute of limitations.

June 28, 1989: "Linda continues to raise the subject of sexual abuse by stepfather again. Begins to understand the relationship that [*sic*] and her sexual identification at present."

July 11, 1989: "Patient continues to discuss the abuse issue. Admits to difficulty in 'forgiving' herself for participating in sexual activity with Jack."

September 6, 1989: "Patient questions whether she is emotionally prepared to confront mother about incest with stepfather."

September 14, 1989: "Continues to talk about incest with stepfather."

December 4, 1989: "A great deal of anger towards stepfather. Questions how she would like to confront past sexual abuse."

December 14, 1989: "States that feelings of rage have been operating in general in past week. Focuses more specifically on stepfather."

The undisputed record thus reveals unambiguously that Linda Gundersen had actual cognition of the misconduct by Jack Bonner well before January 2, 1990. Her claims therefore must, like her sister's, be barred because of the expiration of the two-year limitations period.

## CONCLUSION

Cases like this call upon courts to re-enact *Rashomon*. As in the great Japanese drama, the characters here all recite their stories with evident sincerity. But is it possible for courts in these cases to get to the truth any more than was possible in the classic Japanese play? The Gundersen sisters firmly believe that these horrid acts occurred, but to what extent could the images depicted be refractions of resonant suggestions of others?[9] Jack Bonner denies that any such acts occurred, but is this the result of age, the death of gray cells, or more than a little psychological "denial"? Did the events of eighteen to twenty-four years ago actually occur as the plaintiffs so vividly described them?

Psychology has, since the time of Freud, been in the business of exploring and finding subjective reality. Courts, on the other hand, are in the business of trying to find objective reality. In cases like this, these two enterprises necessarily clash. Indeed, reasonable people could well wonder whether courts are suited at all to deal

---

8. The Pennsylvania Superior Court, quoting Prosser and Keeton, *Law of Torts* 39 (5th Ed. 1984), has held, for example, that the elements of the tort of battery are "a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff ... to suffer such a contact, or apprehension that such a contact is imminent", *Levenson v. Souser*, 384 Pa.Super. 132, 146, 557 A.2d 1081, 1088, *appeal denied*, 524 Pa. 621, 571 A.2d 383 (1989).

9. There is a large and apparently growing literature dealing with this question. *See*, for a recent discussion of the problem, Carol Tavris's "Beware the Incest–Survivor Machine", *New York Times* Book Review, January 3, 1993, p. 1, and the debate engendered by Ms. Tavris's article in the February 14, 1993 *Times* Book Review, at pp. 3 and 27.

with problems like these. To the extent, however, that courts are required to determine these questions, there is no doubt in our mind that the objective enterprise is far better served by receiving fresher evidence than recollections of events that occurred eighteen to twenty-four years ago.

We therefore granted defendants' motion.[10]

10. We wish to acknowledge the significant contribution of the Philadelphia Volunteers for the Indigent Program, which made available the considerable services of Samuel Stretton, Esquire, who represented the defendants on a *pro bono* basis. We are most grateful to Mr. Stretton and Philadelphia VIP for taking on this task.